# VERIZON COMMUNICATIONS INC. *v.* LAW OFFICES OF CURTIS V. TRINKO, LLP

No. 02–682.  Argued October 14, 2003—Decided January 13, 2004

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which SOUTER and THOMAS, JJ., joined, *post*, p. 416.

*Richard G. Taranto* argued the cause for petitioner. With him on the briefs were *John Thorne, Michael K. Kellogg, Mark C. Hansen, Aaron M. Panner*, and *Henry B. Gutman.*

*Solicitor General Olson* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Acting Assistant Attorney General Pate, Deputy Solicitor General Clement, Jeffrey A. Lamken, Catherine G. O'Sullivan, Nancy C. Garrison,* and *David Seidman.*

*Donald B. Verrilli, Jr.*, argued the cause for respondent. With him on the brief were *Alice McInerney, Bruce V. Spiva, Ian Heath Gershengorn, Marc A. Goldman, Elaine J. Goldenberg,* and *Chester T. Kamin.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Virginia et al. by *Jerry W. Kilgore*, Attorney General of Virginia, *William H. Hurd*, State Solicitor, *Maureen Riley Matsen* and *William E. Thro*, Deputy State Solicitors, *Judith Williams Jagdmann*, Deputy Attorney General, *C. Meade Browder, Jr.*, Senior Assistant Attorney General, and *Sarah Oxenham Allen* and *Raymond L. Doggett, Jr.*, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.*, of Alabama, *M. Jane Brady* of Delaware, *Steve Carter* of Indiana, *Jon Bruning* of Nebraska, *Peter W. Heed* of New Hampshire, *W. A. Drew Edmondson* of Oklahoma, and *Mark L. Shurtleff* of Utah; for BellSouth Corp. et al. by *Stephen M. Shapiro, John E. Muench, Jeffrey W. Sarles, Marc Gary, Marc W. F. Galonsky,* and *William M. Schur;* for the Communications Workers of America by *Patrick M. Scanlon, Andrew D. Roth,* and *Laurence Gold;* for the Telecommunications Industry Association by *Donald I. Baker;* for United Parcel Service, Inc., et al. by *Drew S. Days III, W. Stephen Smith, Beth S. Brinkmann, Paul T. Friedman,* and *Peter M. Kreindler;* for the United

JUSTICE SCALIA delivered the opinion of the Court.

The Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 56, imposes certain duties upon incumbent local telephone companies in order to facilitate market entry by competitors, and establishes a complex regime for monitoring and enforcement. In this case we consider whether a complaint alleging breach of the incumbent's duty under the 1996 Act to share its network with competitors states a claim under § 2 of the Sherman Act, 26 Stat. 209.

States Telecom Association by *William T. Lake, James F. Rill, James W. Olson,* and *Michael T. McMenamin;* and for the Washington Legal Foundation by *Steven G. Bradbury, Daniel J. Popeo,* and *David A. Price.*

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Eliot Spitzer,* Attorney General of New York, *Caitlin J. Halligan,* Solicitor General, *Michelle Aronowitz,* Deputy Solicitor General, *Daniel J. Chepaitis,* Assistant Solicitor General, and *Jay L. Himes, Susanna M. Zwerling, Richard L. Schwartz,* and *Keith H. Gordon,* Assistant Attorneys General, by *Robert J. Spagnoletti,* Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective jurisdictions as follows: *Terry Goddard* of Arizona, *Richard Blumenthal* of Connecticut, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Michael A. Cox* of Michigan, *Mike Hatch* of Minnesota, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Hardy Myers* of Oregon, *Anabelle Rodríguez* of Puerto Rico, *William Sorrell* of Vermont, *Darrell V. McGraw, Jr.,* of West Virginia, and *Peggy A. Lautenschlager* of Wisconsin; for Allegiance Telecom, Inc., et al. by *Richard M. Rindler, Eric J. Branfman, Rebecca P. Dick, Christopher A. Holt,* and *Richard Metzger;* for the American Antitrust Institute by *Jonathan L. Rubin* and *Albert A. Foer;* for AT&T Corp. et al. by *David W. Carpenter* and *Stephen T. Perkins;* for the Consumers Union et al. by *Michael D. McNeely* and *Patrick J. O'Connor;* for Covad Communications Co., Inc., by *Alfred C. Pfeiffer, Jr.;* for Economics Professors by *Carter G. Phillips* and *C. Frederick Beckner III;* for Law Professors by *Steven Semeraro;* for the National Association of State Utility Consumer Advocates by *Gerald A. Norlander* and *Robert S. Tongren;* and for Z-Tel Technologies, Inc., by *Christopher J. Wright.*

*Robert H. Bork* filed a brief for the Project to Promote Competition and Innovation in the Digital Age as *amicus curiae.*

## I

Petitioner Verizon Communications Inc. is the incumbent local exchange carrier (LEC) serving New York State. Before the 1996 Act, Verizon,[1] like other incumbent LECs, enjoyed an exclusive franchise within its local service area. The 1996 Act sought to "uproo[t]" the incumbent LECs' monopoly and to introduce competition in its place. *Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 488 (2002). Central to the scheme of the Act is the incumbent LEC's obligation under 47 U. S. C. § 251(c) to share its network with competitors, see *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 371 (1999), including provision of access to individual elements of the network on an "unbundled" basis. § 251(c)(3). New entrants, so-called competitive LECs, resell these unbundled network elements (UNEs), recombined with each other or with elements belonging to the LECs.

Verizon, like other incumbent LECs, has taken two significant steps within the Act's framework in the direction of increased competition. First, Verizon has signed interconnection agreements with rivals such as AT&T, as it is obliged to do under § 252, detailing the terms on which it will make its network elements available. (Because Verizon and AT&T could not agree upon terms, the open issues were subjected to compulsory arbitration under §§ 252(b) and (c).) In 1997, the state regulator, New York's Public Service Commission (PSC), approved Verizon's interconnection agreement with AT&T.

Second, Verizon has taken advantage of the opportunity provided by the 1996 Act for incumbent LECs to enter the long-distance market (from which they had long been excluded). That required Verizon to satisfy, among other things, a 14-item checklist of statutory requirements, which

---

[1] In 1996, NYNEX was the incumbent LEC for New York State. NYNEX subsequently merged with Bell Atlantic Corporation, and the merged entity retained the Bell Atlantic name; a further merger produced Verizon. We use "Verizon" to refer to NYNEX and Bell Atlantic as well.

includes compliance with the Act's network-sharing duties. §§ 271(d)(3)(A) and (c)(2)(B). Checklist item two, for example, includes "[n]ondiscriminatory access to network elements in accordance with the requirements" of § 251(c)(3). § 271(c)(2)(B)(ii). Whereas the state regulator approves an interconnection agreement, for long-distance approval the incumbent LEC applies to the Federal Communications Commission (FCC). In December 1999, the FCC approved Verizon's § 271 application for New York.

Part of Verizon's UNE obligation under § 251(c)(3) is the provision of access to operations support systems (OSS), a set of systems used by incumbent LECs to provide services to customers and ensure quality. Verizon's interconnection agreement and long-distance authorization each specified the mechanics by which its OSS obligation would be met. As relevant here, a competitive LEC sends orders for service through an electronic interface with Verizon's ordering system, and as Verizon completes certain steps in filling the order, it sends confirmation back through the same interface. Without OSS access a rival cannot fill its customers' orders.

In late 1999, competitive LECs complained to regulators that many orders were going unfilled, in violation of Verizon's obligation to provide access to OSS functions. The PSC and FCC opened parallel investigations, which led to a series of orders by the PSC and a consent decree with the FCC.[2] Under the FCC consent decree, Verizon undertook

<hr>

[2] Order Directing Improvements To Wholesale Service Performance, *MCI WorldCom, Inc. v. Bell Atlantic-New York*, Nos. 00–C–0008, 00–C–0009, 2000 WL 363378 (N. Y. PSC, Feb. 11, 2000); Order Directing Market Adjustments and Amending Performance Assurance Plan, *MCI World-Com, Inc. v. Bell Atlantic-New York*, Nos. 00–C–0008, 00–C–0009, 99–C–0949, 2000 WL 517633 (N. Y. PSC, Mar. 23, 2000); Order Addressing OSS Issues, *MCI WorldCom, Inc. v. Bell Atlantic-New York*, Nos. 00–C–0008, 00–C–0009, 99–C–0949, 2000 WL 1531916 (N. Y. PSC, July 27, 2000); *In re Bell Atlantic-New York Authorization Under Section 271 of the Communications Act to Provide In-Region, InterLATA Service In the State of New York*, 15 FCC Rcd. 5413 (2000) (Order); *id.*, at 5415 (Consent Decree).

to make a "voluntary contribution" to the U. S. Treasury in the amount of $3 million, 15 FCC Rcd. 5415, 5421, ¶ 16 (2000); under the PSC orders, Verizon incurred liability to the competitive LECs in the amount of $10 million. Under the consent decree and orders, Verizon was subjected to new performance measurements and new reporting requirements to the FCC and PSC, with additional penalties for continued noncompliance. In June 2000, the FCC terminated the consent decree. *Enforcement Bureau Announces that Bell Atlantic Has Satisfied Consent Decree Regarding Electronic Ordering Systems in New York* (June 20, 2000), http://www. fcc.gov/eb/News_Releases/bellatlet.html (all Internet materials as visited Dec. 12, 2003, and available in Clerk of Court's case file). The next month the PSC relieved Verizon of the heightened reporting requirement. *Order Addressing OSS Issues, MCI WorldCom, Inc.* v. *Bell Atlantic-New York*, Nos. 00–C–0008, 00–C–0009, 99–C–0949, 2000 WL 1531916 (N. Y. PSC, July 27, 2000).

Respondent Law Offices of Curtis V. Trinko, LLP, a New York City law firm, was a local telephone service customer of AT&T. The day after Verizon entered its consent decree with the FCC, respondent filed a complaint in the District Court for the Southern District of New York, on behalf of itself and a class of similarly situated customers. See App. 12–33. The complaint, as later amended, *id.*, at 34–50, alleged that Verizon had filled rivals' orders on a discriminatory basis as part of an anticompetitive scheme to discourage customers from becoming or remaining customers of competitive LECs, thus impeding the competitive LECs' ability to enter and compete in the market for local telephone service. See, *e. g., id.*, at 34–35, 46–47, ¶¶ 1, 2, 52, 54. According to the complaint, Verizon "has filled orders of [competitive LEC] customers after filling those for its own local phone service, has failed to fill in a timely manner, or not at all, a substantial number of orders for [competitive LEC] customers . . . , and has systematically failed to inform [com-

petitive LECs] of the status of their customers' orders."
*Id.*, at 39, ¶ 21. The complaint set forth a single example of
the alleged "failure to provide adequate access to [competi-
tive LECs]," namely, the OSS failure that resulted in the
FCC consent decree and PSC orders. *Id.*, at 40, ¶ 22. It
asserted that the result of Verizon's improper "behavior with
respect to providing access to its local loop" was to "deter
potential customers [of rivals] from switching." *Id.*, at 35,
47, ¶¶ 2, 57. The complaint sought damages and injunctive
relief for violation of § 2 of the Sherman Act, 15 U. S. C. § 2,
pursuant to the remedy provisions of §§ 4 and 16 of the Clay-
ton Act, 38 Stat. 731, as amended, 15 U. S. C. §§ 15, 26. The
complaint also alleged violations of the 1996 Act, § 202(a) of
the Communications Act of 1934, 48 Stat. 1064, as amended,
47 U. S. C. § 151 *et seq.*, and state law.

The District Court dismissed the complaint in its entirety.
As to the antitrust portion, it concluded that respondent's
allegations of deficient assistance to rivals failed to satisfy
the requirements of § 2. The Court of Appeals for the Sec-
ond Circuit reinstated the complaint in part, including the
antitrust claim. 305 F. 3d 89, 113 (2002). We granted cer-
tiorari, limited to the question whether the Court of Appeals
erred in reversing the District Court's dismissal of respond-
ent's antitrust claims. 538 U. S. 905 (2003).

## II

To decide this case, we must first determine what effect
(if any) the 1996 Act has upon the application of traditional
antitrust principles. The Act imposes a large number of du-
ties upon incumbent LECs—above and beyond those basic
responsibilities it imposes upon all carriers, such as assuring
number portability and providing access to rights-of-way, see
47 U. S. C. §§ 251(b)(2), (4). Under the sharing duties of
§ 251(c), incumbent LECs are required to offer three kinds
of access. Already noted, and perhaps most intrusive, is the
duty to offer access to UNEs on "just, reasonable, and non-

discriminatory" terms, § 251(c)(3), a phrase that the FCC has interpreted to mean a price reflecting long-run incremental cost. See *Verizon Communications Inc.* v. *FCC*, 535 U. S., at 495–496. A rival can interconnect its own facilities with those of the incumbent LEC, or it can simply purchase services at wholesale from the incumbent and resell them to consumers. See §§ 251(c)(2), (4). The Act also imposes upon incumbents the duty to allow physical "collocation"—that is, to permit a competitor to locate and install its equipment on the incumbent's premises—which makes feasible interconnection and access to UNEs. See § 251(c)(6).

That Congress created these duties, however, does not automatically lead to the conclusion that they can be enforced by means of an antitrust claim. Indeed, a detailed regulatory scheme such as that created by the 1996 Act ordinarily raises the question whether the regulated entities are not shielded from antitrust scrutiny altogether by the doctrine of implied immunity. See, *e. g., United States* v. *National Assn. of Securities Dealers, Inc.,* 422 U. S. 694 (1975); *Gordon* v. *New York Stock Exchange, Inc.,* 422 U. S. 659 (1975). In some respects the enforcement scheme set up by the 1996 Act is a good candidate for implication of antitrust immunity, to avoid the real possibility of judgments conflicting with the agency's regulatory scheme "that might be voiced by courts exercising jurisdiction under the antitrust laws." *United States* v. *National Assn. of Securities Dealers, Inc., supra,* at 734.

Congress, however, precluded that interpretation. Section 601(b)(1) of the 1996 Act is an antitrust-specific saving clause providing that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." 110 Stat. 143, 47 U. S. C. § 152, note. This bars a finding of implied immunity. As the FCC has put the point, the saving clause preserves those "claims that satisfy established antitrust standards." Brief for United States and the Federal

Communications Commission as *Amici Curiae* Supporting Neither Party in No. 02–7057, *Covad Communications Co. v. Bell Atlantic Corp.* (CADC), p. 8.

But just as the 1996 Act preserves claims that satisfy existing antitrust standards, it does not create new claims that go beyond existing antitrust standards; that would be equally inconsistent with the saving clause's mandate that nothing in the Act "modify, impair, or supersede the applicability" of the antitrust laws. We turn, then, to whether the activity of which respondent complains violates pre-existing antitrust standards.

## III

The complaint alleges that Verizon denied interconnection services to rivals in order to limit entry. If that allegation states an antitrust claim at all, it does so under § 2 of the Sherman Act, 15 U. S. C. § 2, which declares that a firm shall not "monopolize" or "attempt to monopolize." *Ibid.* It is settled law that this offense requires, in addition to the possession of monopoly power in the relevant market, "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U. S. 563, 570–571 (1966). The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*

Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying pur-

pose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919).

However, "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U. S. 585, 601 (1985). Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2. We have been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm. The question before us today is whether the allegations of respondent's complaint fit within existing exceptions or provide a basis, under traditional antitrust principles, for recognizing a new one.

The leading case for § 2 liability based on refusal to cooperate with a rival, and the case upon which respondent understandably places greatest reliance, is *Aspen Skiing, supra.* The Aspen ski area consisted of four mountain areas. The defendant, who owned three of those areas, and the plaintiff, who owned the fourth, had cooperated for years in the issuance of a joint, multiple-day, all-area ski ticket. After repeatedly demanding an increased share of the proceeds, the defendant canceled the joint ticket. The plaintiff, concerned that skiers would bypass its mountain without some joint

offering, tried a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price. *Id.,* at 593–594. The defendant refused even that. We upheld a jury verdict for the plaintiff, reasoning that "[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.,* at 608.

*Aspen Skiing* is at or near the outer boundary of § 2 liability. The Court there found significance in the defendant's decision to cease participation in a cooperative venture. See *id.,* at 608, 610–611. The unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. *Ibid.* Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent.

The refusal to deal alleged in the present case does not fit within the limited exception recognized in *Aspen Skiing.* The complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion. Here, therefore, the defendant's prior conduct sheds no light upon the motivation of its refusal to deal—upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice. The contrast between the cases is heightened by the difference in pricing behavior. In *Aspen Skiing,* the defendant turned down a proposal to sell at its own retail price, suggesting a calculation that its future monopoly retail price would be higher. Verizon's reluctance to interconnect at the cost-based rate of compensation available under § 251(c)(3) tells us nothing about dreams of monopoly.

The specific nature of what the 1996 Act compels makes this case different from *Aspen Skiing* in a more fundamental

way. In *Aspen Skiing*, what the defendant refused to provide to its competitor was a product that it already sold at retail—to oversimplify slightly, lift tickets representing a bundle of services to skiers. Similarly, in *Otter Tail Power Co.* v. *United States*, 410 U. S. 366 (1973), another case relied upon by respondent, the defendant was already in the business of providing a service to certain customers (power transmission over its network), and refused to provide the same service to certain other customers. *Id.*, at 370–371, 377–378. In the present case, by contrast, the services allegedly withheld are not otherwise marketed or available to the public. The sharing obligation imposed by the 1996 Act created "something brand new"—"the wholesale market for leasing network elements." *Verizon Communications Inc.* v. *FCC*, 535 U. S., at 528. The unbundled elements offered pursuant to § 251(c)(3) exist only deep within the bowels of Verizon; they are brought out on compulsion of the 1996 Act and offered not to consumers but to rivals, and at considerable expense and effort. New systems must be designed and implemented simply to make that access possible—indeed, it is the failure of one of those systems that prompted the present complaint.[3]

We conclude that Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents. This conclusion would be unchanged even if we considered to be established law the "essential facilities" doctrine crafted by some lower courts, under which the Court of Appeals concluded respondent's allegations might state a claim. See generally Areeda, Essential Facilities: An Epi-

---

[3] Respondent also relies upon *United States* v. *Terminal Railroad Assn. of St. Louis*, 224 U. S. 383 (1912), and *Associated Press* v. *United States*, 326 U. S. 1 (1945). These cases involved *concerted* action, which presents greater anticompetitive concerns and is amenable to a remedy that does not require judicial estimation of free-market forces: simply requiring that the outsider be granted nondiscriminatory admission to the club.

thet in Need of Limiting Principles, 58 Antitrust L. J. 841 (1989). We have never recognized such a doctrine, see *Aspen Skiing Co.,* 472 U. S., at 611, n. 44; *AT&T Corp.* v. *Iowa Utilities Bd.,* 525 U. S., at 428 (opinion of BREYER, J.), and we find no need either to recognize it or to repudiate it here. It suffices for present purposes to note that the indispensable requirement for invoking the doctrine is the unavailability of access to the "essential facilities"; where access exists, the doctrine serves no purpose. Thus, it is said that "essential facility claims should . . . be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." P. Areeda & H. Hovenkamp, Antitrust Law, p. 150, ¶ 773e (2003 Supp.). Respondent believes that the existence of sharing duties under the 1996 Act supports its case. We think the opposite: The 1996 Act's extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access. To the extent respondent's "essential facilities" argument is distinct from its general § 2 argument, we reject it.

## IV

Finally, we do not believe that traditional antitrust principles justify adding the present case to the few existing exceptions from the proposition that there is no duty to aid competitors. Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation. As we have noted, "careful account must be taken of the pervasive federal and state regulation characteristic of the industry." *United States* v. *Citizens & Southern Nat. Bank,* 422 U. S. 86, 91 (1975); see also IA P. Areeda & H. Hovenkamp, Antitrust Law, p. 12, ¶ 240c3 (2d ed. 2000). "[A]ntitrust analysis must sensitively recognize and reflect the distinctive economic and legal setting of the regulated industry to which it applies." *Concord* v. *Boston Edison Co.,* 915 F. 2d 17,

22 (CA1 1990) (Breyer, C. J.) (internal quotation marks omitted).

One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny. Where, by contrast, "[t]here is nothing built into the regulatory scheme which performs the antitrust function," *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 358 (1963), the benefits of antitrust are worth its sometimes considerable disadvantages. Just as regulatory context may in other cases serve as a basis for implied immunity, see, *e. g., United States* v. *National Assn. of Securities Dealers, Inc.*, 422 U. S., at 730–735, it may also be a consideration in deciding whether to recognize an expansion of the contours of § 2.

The regulatory framework that exists in this case demonstrates how, in certain circumstances, "regulation significantly diminishes the likelihood of major antitrust harm." *Concord* v. *Boston Edison Co., supra,* at 25. Consider, for example, the statutory restrictions upon Verizon's entry into the potentially lucrative market for long-distance service. To be allowed to enter the long-distance market in the first place, an incumbent LEC must be on good behavior in its local market. Authorization by the FCC requires state-by-state satisfaction of § 271's competitive checklist, which as we have noted includes the nondiscriminatory provision of access to UNEs. Section 271 applications to provide long-distance service have now been approved for incumbent LECs in 47 States and the District of Columbia. See FCC Authorizes SBC to Provide Long Distance Service in Illinois, Indiana, Ohio and Wisconsin (Oct. 15, 2003), http://hraunfoss. fcc.gov/edocs_ public/attachmatch/DOC-239978A1.pdf.

The FCC's § 271 authorization order for Verizon to provide long-distance service in New York discussed at great length Verizon's commitments to provide access to UNEs, including

the provision of OSS. *In re Application by Bell Atlantic New York for Authorization Under Section 271 of the Communications Act To Provide In-Region, InterLATA Service in the State of New York*, 15 FCC Rcd. 3953, 3989–4077, ¶¶ 82–228 (1999) (Memorandum Opinion and Order) (hereinafter *In re Application*). Those commitments are enforceable by the FCC through continuing oversight; a failure to meet an authorization condition can result in an order that the deficiency be corrected, in the imposition of penalties, or in the suspension or revocation of long-distance approval. See 47 U. S. C. § 271(d)(6)(A). Verizon also subjected itself to oversight by the PSC under a so-called "Performance Assurance Plan" (PAP). See *In re New York Telephone Co.*, 197 P. U. R. 4th 266, 280–281 (N. Y. PSC, 1999) (Order Adopting the Amended PAP). The PAP, which by its terms became binding upon FCC approval, provides specific financial penalties in the event of Verizon's failure to achieve detailed performance requirements. The FCC described Verizon's having entered into a PAP as a significant factor in its § 271 authorization, because that provided "a strong financial incentive for post-entry compliance with the section 271 checklist," and prevented " 'backsliding.' " *In re Application* 3958–3959, ¶¶ 8, 12.

The regulatory response to the OSS failure complained of in respondent's suit provides a vivid example of how the regulatory regime operates. When several competitive LECs complained about deficiencies in Verizon's servicing of orders, the FCC and PSC responded. The FCC soon concluded that Verizon was in breach of its sharing duties under § 251(c), imposed a substantial fine, and set up sophisticated measurements to gauge remediation, with weekly reporting requirements and specific penalties for failure. The PSC found Verizon in violation of the PAP even earlier, and imposed additional financial penalties and measurements with *daily* reporting requirements. In short, the regime was an effective steward of the antitrust function.

Against the slight benefits of antitrust intervention here, we must weigh a realistic assessment of its costs. Under the best of circumstances, applying the requirements of §2 "can be difficult" because "the means of illicit exclusion, like the means of legitimate competition, are myriad." *United States* v. *Microsoft Corp.*, 253 F. 3d 34, 58 (CADC 2001) (en banc) *(per curiam)*. Mistaken inferences and the resulting false condemnations "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 594 (1986). The cost of false positives counsels against an undue expansion of §2 liability. One false-positive risk is that an incumbent LEC's failure to provide a service with sufficient alacrity might have nothing to do with exclusion. Allegations of violations of §251(c)(3) duties are difficult for antitrust courts to evaluate, not only because they are highly technical, but also because they are likely to be extremely numerous, given the incessant, complex, and constantly changing interaction of competitive and incumbent LECs implementing the sharing and interconnection obligations. *Amici* States have filed a brief asserting that competitive LECs are threatened with "death by a thousand cuts," Brief for New York et al. as *Amici Curiae* 10 (internal quotation marks omitted)—the identification of which would surely be a daunting task for a generalist antitrust court. Judicial oversight under the Sherman Act would seem destined to distort investment and lead to a new layer of interminable litigation, atop the variety of litigation routes already available to and actively pursued by competitive LECs.

Even if the problem of false positives did not exist, conduct consisting of anticompetitive violations of §251 may be, as we have concluded with respect to above-cost predatory pricing schemes, "beyond the practical ability of a judicial tribunal to control." *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U. S. 209, 223 (1993). Effective

remediation of violations of regulatory sharing requirements will ordinarily require continuing supervision of a highly detailed decree. We think that Professor Areeda got it exactly right: "No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." Areeda, 58 Antitrust L. J., at 853. In this case, respondent has requested an equitable decree to "[p]reliminarily and permanently enjoi[n] [Verizon] from providing access to the local loop market . . . to [rivals] on terms and conditions that are not as favorable" as those that Verizon enjoys. App. 49–50. An antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations.[4]

\* \* \*

The 1996 Act is, in an important respect, much more ambitious than the antitrust laws. It attempts *"to eliminate the monopolies* enjoyed by the inheritors of AT&T's local franchises." *Verizon Communications Inc.* v. *FCC,* 535 U. S., at 476 (emphasis added). Section 2 of the Sherman Act, by contrast, seeks merely to prevent *unlawful monopolization.* It would be a serious mistake to conflate the two goals. The Sherman Act is indeed the "Magna Carta of free enterprise," *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 610 (1972), but it does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some

---

[4] The Court of Appeals also thought that respondent's complaint might state a claim under a "monopoly leveraging" theory (a theory barely discussed by respondent, see Brief for Respondent 24, n. 10). We disagree. To the extent the Court of Appeals dispensed with a requirement that there be a "dangerous probability of success" in monopolizing a second market, it erred, *Spectrum Sports, Inc.* v. *McQuillan,* 506 U. S. 447, 459 (1993). In any event, leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected.

other approach might yield greater competition. We conclude that respondent's complaint fails to state a claim under the Sherman Act.[5]

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE THOMAS join, concurring in the judgment.

In complex cases it is usually wise to begin by deciding whether the plaintiff has standing to maintain the action. Respondent, the plaintiff in this case, is a local telephone service customer of AT&T. Its complaint alleges that it has received unsatisfactory service because Verizon has engaged in conduct that adversely affects AT&T's ability to serve its customers, in violation of §2 of the Sherman Act. 15 U. S. C. §2. Respondent seeks from Verizon treble damages, a remedy that §4 of the Clayton Act makes available to "any person who shall be injured in his business or property." 15 U. S. C. §15. The threshold question presented by the complaint is whether, assuming the truth of its allegations, respondent is a "person" within the meaning of §4.

Respondent would unquestionably be such a "person" if we interpreted the text of the statute literally. But we have eschewed a literal reading of §4, particularly in cases in which there is only an indirect relationship between the defendant's alleged misconduct and the plaintiff's asserted injury. *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters,* 459 U. S. 519, 529–535 (1983). In such cases, "the importance of avoiding either the risk of duplicate recoveries

---

[5] Our disposition makes it unnecessary to consider petitioner's alternative contention that respondent lacks antitrust standing. See *Steel Co.* v. *Citizens for Better Environment,* 523 U. S. 83, 97, and n. 2 (1998); *National Railroad Passenger Corporation* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 456 (1974).

on the one hand, or the danger of complex apportionment of damages on the other," weighs heavily against a literal reading of § 4. *Id.*, at 543–544. Our interpretation of § 4 has thus adhered to Justice Holmes' observation that the "general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 533 (1918).

I would not go beyond the first step in this case. Although respondent contends that its injuries were, like the plaintiff's injuries in *Blue Shield of Va.* v. *McCready*, 457 U. S. 465, 479 (1982), "the very means by which . . . [Verizon] sought to achieve its illegal ends," it remains the case that whatever antitrust injury respondent suffered because of Verizon's conduct was purely derivative of the injury that AT&T suffered. And for that reason, respondent's suit, unlike *McCready*, runs both the risk of duplicative recoveries and the danger of complex apportionment of damages. The task of determining the monetary value of the harm caused to respondent by AT&T's inferior service, the portion of that harm attributable to Verizon's misconduct, whether all or just some of such possible misconduct was prohibited by the Sherman Act, and what offset, if any, should be allowed to make room for a recovery that would make AT&T whole, is certain to be daunting. AT&T, as the direct victim of Verizon's alleged misconduct, is in a far better position than respondent to vindicate the public interest in enforcement of the antitrust laws. Denying a remedy to AT&T's customer is not likely to leave a significant antitrust violation undetected or unremedied, and will serve the strong interest "in keeping the scope of complex antitrust trials within judicially manageable limits." *Associated Gen. Contractors,* 459 U. S., at 543.

In my judgment, our reasoning in *Associated General Contractors* requires us to reverse the judgment of the Court of Appeals. I would not decide the merits of the § 2

claim unless and until such a claim is advanced by either AT&T or a similarly situated competitive local exchange carrier.