**Melanie TUCKER, Plaintiff,**

v.

**APPLE COMPUTER, INC., Defendant.**

**No. C 06–04457 JW.**

United States District Court, N.D. California. San Jose Division.

Dec. 20, 2006.

Bonny E. Sweeney, Gregory S. Weston, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, Andrew S. Friedman, Elaine A. Ryan, Todd D. Carpenter, Bonnett Fairbourn Friedman & Balint, P.C., Phoenix, AZ, for Plaintiff.

Robert A. Mittelstaedt, Adam Richard Sand, Esq., Tracy Strong, Jones Day, San Francisco, CA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

WARE, District Judge.

### I. INTRODUCTION

Plaintiff Melanie Tucker ("Plaintiff") brings this antitrust action against Defendant Apple Computer, Inc. ("Apple"), alleging violations of the Sherman Act, 15 U.S.C. § 1, *et seq.*, and related state law claims. Plaintiff alleges that Apple has unlawfully tied sales of its iPod portable digital music player and online digital music files sold through its iTunes online music store ("iTMS"), in violation of federal and state antitrust laws. Before the Court is Apple's Motion to Dismiss Antitrust Claims. The Court conducted a hearing on November 20, 2006. Based upon the papers submitted to date and the oral arguments of counsel, the Court DENIES Apple's Motion to Dismiss.

### II. BACKGROUND

The Plaintiff alleges as follows:

Plaintiff purchased a 20 GB iPod from Apple through iTMS. (Complaint for Violations of Sherman Antitrust Act, Cartwright Act, California Unfair Competition Law, Consumer Legal Remedies Act, and Monopolization of Business Practices ¶ 18, hereafter, "Compl.," Docket Item No. 1.) In April 2005 and periodically thereafter, she purchased music from iTMS, downloaded the music to her personal computer, and uploaded the music from her personal computer to her iPod. (Compl. ¶ 19.)

Apple owns and operates iTMS, an Internet site that offers digital music and video computer files for online pur-

chase and download. (Compl.¶ 2.) iTMS is accessed with proprietary Apple software rather than an Internet browser. *Id.* Apple designs the hardware and software of its iPod digital music player ("iPod"). *Id.*

The "Online Music Market" is the market for digital music delivered to the consumer by way of Internet download ("Online Music"). (Compl.¶ 3.) Apple's share of the Online Music Market is 83 percent. (Compl.¶ 5.) The "Online Video Market" is the market for digital video files that are purchased and downloaded via the Internet that can be viewed both on a home computer and a video-enabled Digital Music Player ("Online Video"). (Compl. ¶ 6.) Apple's share of the Online Video Market is at least 75 percent. (Compl.¶ 7.) The "Digital Music Player Market" is the market for portable battery-powered devices that can store and play large numbers of digital music computer files. (Compl.¶ 8.) This latter market is comprised of two major types of digital music players, those that store music files on miniature hard drives and those that store music using flash memory. (Compl.¶ 9.) Apple has more than 90 percent market share for the hard drive-based player market, and a 70 percent market share of the flash memory-based market. *Id.* All three markets described above refer to the United States only. (Compl.¶ 11.)

Apple deliberately makes digital music purchased at iTMS inoperable with its competitors' digital music players. (Compl.¶ 14.) In order to play music from iTMS on a digital music player, then, a consumer's only option is the iPod. *Id.* Apple sells the iPod at prices far exceeding those that would prevail in a competitive marketplace. *Id.* Apple also makes the iPod unable to play music sold at its competitors' online music stores. (Compl.¶ 15.) In order to purchase Online Music to play on an iPod,

then, a consumer's only option is iTMS. *Id.*

Improved hard drive and video compression technology has recently made feasible playback of video content (e.g. television shows) on Digital Music Players. (Compl.¶ 16.) Apple uses the same tactics described above to block consumers from purchasing and playing its competitors' Online Video on iPods. *Id.*

Online Music is available in protected and unprotected digital file formats. (Compl.¶ 33.) Protected formats feature technological encumbrances designed to prevent consumers from making illegal, unauthorized copies of digital files. *Id.* The major record companies, which control the copyrights to most popular music, are generally unwilling to license their music for online sale except in protected formats. (Compl.¶ 34.) Most Online Music stores sell protected music files in WMA format, including America Online, Wal–Mart, Napster, MusicMatch, Best Buy, Yahoo! Music, FYE Download Zone, and Virgin Digital. (Compl.¶ 35.) The cost to Apple of licensing the WMA format would not likely exceed $800,000 per year, or three cents per iPod sold in 2005. (Compl.¶ 40.)

Apple outsources the majority of iPod production to Asian third-party manufacturers. (Compl.¶ 37.) The iPod's "core processor" is the Portal Player System–On–A–Chip, which by default supports files in WMA format. *Id.* Apple deliberately designed iPod's software to play only a single protected digital format, Apple's FairPlay-modified AAC format ("FairPlay"). *Id.* Deliberately disabling a desirable feature of a computer product is known as "crippling" the product, and software that has this effect is known as "crippleware." *Id.* Since iPod is prevented by crippleware from playing any protected format other

than FairPlay, iPod owners' only option for purchasing Online Music is to use iTMS. (Compl. ¶ 38.)

For Apple's "low-end" digital music player, the iPod Shuffle, Apple uses the SigmaTel STMP3550 chip. (Compl. ¶ 39.) Like the Portal Player System–On–A–Chip, the SigmaTel STMP3550 was designed to decode and play WMA files, and does so on every digital media player that contains the chip except for the iPod shuffle. *Id.* The iPod shuffle does not play WMA files due to Apple's crippleware operating system. *Id.*

Apple makes the FairPlay music files purchased on iTMS incapable of being played by other digital music players. (Compl. ¶ 41.) Consumers who have purchased Online Music from Apple to play on their home computers must buy an iPod if they want to play their music on a digital music player. *Id.* Consumers who first purchase an iPod cannot purchase Online Music for play on iPod from any company besides Apple. (Compl. ¶ 42.)

Apple has been able to charge iPod purchasers a supracompetitive price by preventing consumers who have purchased music files from iTMS from playing their music on Apple's competitors' digital media players. (Compl. ¶ 54.) By preventing iPod owners from buying music from Online Music retailers other than iTMS, Apple "deters consumers from even considering doing business with its competitors' music and video stores, allowing it to monopolize these markets." (Compl. ¶ 55.)

Plaintiff filed this claim alleging seven causes of action. Her first three causes of action are for violation of the Sherman Act, 15 U.S.C. §§ 1, *et seq.,* for (1) unlawful tying or bundling of Online Video and FairPlay music files to the iPod; (2) the unlawful acquisition or maintenance of monopoly power in the digital music player market; and (3) for attempted monopolization of the online music and video markets. Her remaining state law causes of action are for (1) violation of the Cartwright Act, Cal. Bus. & Prof.Code §§ 16720 *et seq.;* (2) violation of the California Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200 *et seq.;* (3) violation of the Consumer Legal Remedies Act, Cal. Civ.Code §§ 1750 *et seq.;* and (4) common law monopolization of business practices.[1] Presently before the Court is Apple's Motion to Dismiss Plaintiff's anti-trust claims.

## III. STANDARDS

██ Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief can be granted against that defendant. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530–, 533–534 (9th Cir.1984). For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987). Any existing ambiguities must be resolved in favor of the pleading. *Walling v. Beverly Enters.,* 476 F.2d 393, 396 (9th Cir.1973).

██ However, mere conclusory allegations couched in factual allegations are not sufficient to state a cause of action. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 810 (9th Cir.1988). A complaint

---

1. These Counts are not at issue for purposes of this Motion.

should not be dismissed under Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir.1989). Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment. *Lopez v. Smith*, 203 F.3d 1122, 1129 (9th Cir.2000).

The Federal Rules of Civil Procedure have established a liberal standard of "notice pleading." A plaintiff's factual pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2) & (e)(1). The Supreme Court has explained that the Federal Rules "do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (quoting Fed.R.Civ.P. 8(a)(2)). The Supreme Court has reaffirmed the liberal notice-pleading requirements by stating that a prima facie case is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema*, 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

## IV. DISCUSSION

### A. Tying Claim

Apple contends that the Sherman Act only proscribes the "tying" of two products, where a seller offers to sell a product for which it has market power only if consumers agree to buy an unwanted product at the same time. (Defendant's Re–Notice of Motion and Motion to Dismiss Antitrust Claims at 11, hereafter,

"Motion," Docket Item No. 11.) Apple further contends that to adopt Plaintiff's theory of liability would require it not only to change the design of its products, but to license software from a competitor—Microsoft. (Motion at 13.) Plaintiff contends that the "overwhelming authority" of caselaw establishes coercion where a firm's exclusionary design forces a consumer to purchase the tying and tied products together. (Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss Antitrust Claims at 14, hereafter, "Opposition," Docket Item No. 18.)

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal..." 15 U.S.C. § 1. Tying in violation of Section 1 can either be a per se violation or a violation of the rule of reason. *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1157–58 (9th Cir. 2001). To establish that a tying arrangement is per se illegal, a plaintiff must prove (1) a tie between two separate products or services sold in separate markets; (2) sufficient economic power in the tying product market to affect the tied market; and (3) an effect on a substantial volume of commerce in the tied product market. *Id.* Implicit in these elements is the need of the seller of the tying product "to force the buyer into the purchase of the tied product that the buyer did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir.2003).

### 1. Individual Coercion

Apple contends that Plaintiff's claim fails because she does not allege individual

coercion. (Motion at 11; Reply in Support of Motion to Dismiss Antitrust Claims at 10, hereafter, "Reply," Docket Item No. 20.) Specifically, Plaintiff alleges only that she purchased an iPod and iTMS music, downloaded the music to her personal computer, and uploaded it to her iPod; she does not allege that Apple coerced her to take any of these actions. (Motion at 11.) Plaintiff contends that it is sufficient to allege coercion generally, i.e. that because Apple deliberately placed a technological limitation in the iPod, iPod owners are coerced into purchasing and downloading music exclusively from Apple's music store. (Opposition at 15.)

 Case law is clear that "some modicum of involuntariness or coercion is . . . essential to the existence of a per se illegal tie-in." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 540 (9th Cir.1983) (partially overruled on other grounds). However, there is no requirement that individual purchaser plaintiffs must allege coercion at the individual level, rather than at the market level, to state a Section 1 tying claim. In the Ninth Circuit, "[t]he essence of an antitrust tying violation is not the seller's unilateral refusal to deal with a buyer who refuses to buy the tied product, but the use by the seller of its 'leverage' to force a purchaser to do something that he would not do in a competitive market." *Murphy v. Business Cards Tomorrow, Inc.*, 854 F.2d 1202, 1204 (9th Cir.1988) (partially overruled on other grounds), quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 n. 20, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Ap-

plying these standards, the Court finds that Plaintiff has satisfactorily alleged coercion.

**2. Per Se Tying**

Plaintiff alleges two theories of antitrust tying: (1) Apple has used technological restrictions to force purchasers of Apple's iPod (tying product) to purchase only Online Music and Online Video from iTMS (tied product); and (2) Apple has used technological restrictions to force purchasers of Online Music and Online Video from iTMS (tying product) to purchase only Apple's iPod (tied product). (Compl.¶¶ 63, 69.) These allegations have injured Plaintiff and the putative class by causing supracompetitive prices in the digital music player market, decreasing the supply and selection of available products, and reducing the number and effectiveness of Apple's competitors. (Compl.¶¶ 64, 70.)

The issue is whether these allegations satisfy each of the three elements of a per se tying violation. Apple's argument contests the first of these three elements, whether a tie exists between iTunes and iTMS files: "Some people buy iPods and never buy music from iTMS. Other people buy music from iTMS and never by an iPod. That some people, like Tucker, choose to buy both does not constitute unlawful tying." (Motion at 12.)

 First, Plaintiff has alleged a tie between separate products sold in separate markets—the Digital Music Player market on one hand, and the Online Music and Online Video markets on the other. (Compl.¶¶ 3, 6, 8.) Second, Plaintiff has alleged that each product is both simultaneously a tying and a tied product.[2] Plain-

---

2. In this respect, Plaintiff's allegations are similar to those originally pled in related case *Slattery v. Apple Computer, Inc.* (now *Charaoensek v. Apple Computer Inc.*), C 05–0037 JW. In that case, the Court held: "Plaintiff alleges that Defendant has market power in the tying product which is used to coerce the

consumer the purchase the tied product. Both Claims include the same two allegedly separate products, the difference being the two products are switched as to which is the "tying" product and which is the "tied" product. It seems inconsistent to allege that a

tiff has alleged sufficient economic power, then, in each of the tying product markets—an 83 percent market share of the Online Music market, a 75 percent market share of the Online Video market, and a 90 percent market share in the hard-drive digital music player market. (Compl.¶¶ 5, 7, 9.) Lastly, Plaintiffs have adequately alleged that Apple's conduct has significantly affected the volume of commerce in each of the tied product markets. (Compl. ¶¶ 12–16; 53–71.)

Apple's argument that some consumers buy only iPods and some buy only iTunes is unavailing. It disregards Plaintiff's definition of the relevant markets, to which the Court confines itself for purposes of this motion. The markets are (1) the market for the legal sale of digital media files (Online Music and Online Video) and (2) the market for the sale of digital media players. Plaintiff alleges that, within these relevant markets, the only legal digital music and video files capable of playing directly on an iPod are music files sold by Apple's iTMS. (Compl.¶ 14.)

The case of *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) is instructive. In that case, independent service organizations (ISOs) began servicing copying and micrographic equipment manufactured by Eastman Kodak Company ("Kodak"). Kodak adopted policies to limit the availability of parts to ISOs and to make it more difficult for them to compete with Kodak in servicing Kodak equipment. For instance, Kodak agreed with original equipment manufacturers that they would only sell parts that fit Kodak equipment to Kodak. *Id.* at 458, 112 S.Ct. 2072. The ISOs sued, claiming *inter alia* that Kodak had violated Section 1 of the Sherman Act

by tying parts and service together. The Supreme Court allowed the tying claim notwithstanding that customers could purchase parts or services separately. *Id.* at 463, 112 S.Ct. 2072. It was no barrier to the ISOs' antitrust claim that "[a]t least some consumers would purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, would purchase parts without service." *Id.*

Analogously, Plaintiff's antitrust claim is not barred simply because some customers purchase iPods and never buy music from iTMS (i.e. never seek to purchase legal digital music files for their iPods) and others buy music from iTMS and never purchase iPods (i.e. never seek to purchase a digital music player to play their files). The Court finds that Plaintiff has sufficiently alleged each of the three elements of a Section 1 per se tying violation.

### 3. Rule of Reason

 The Rule of Reason requires the fact-finder to examine the anti-competitive effects and the pro-competitive effects of the defendant's challenged business practice to determine whether, on balance, the practice is unreasonable. *Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991). Since the Court finds that Plaintiff has adequately pled a per se tying arrangement, the Court need not consider whether she has also pled a violation under the Rule of Reason.

### B. *Monopolization Claim*

Apple contends that the Court should dismiss Plaintiff's monopolization claim because Apple does not satisfy one of three requirements for a Section 2 monopoliza-

---

product is both a "tying" product and a "tied" product. However, for pleading purposes, the Court will allow the inconsistency to persist. At some appropriate point in the

litigation, an election might be necessary." (Docket Item No. 35 at 4–5.) The same reasoning is applicable here.

tion claim, i.e., the willful acquisition or maintenance of monopoly power. Apple contends that since the only way Apple could avoid liability in this case is to enter into a transaction with another company, Plaintiff's claim is for refusal to deal and must be analyzed under the standard of *Verizon Communications, Inc. v. Trinko*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). (Motion at 6–10.) Plaintiff characterizes her claims as alleging Apple's willful acquisition and maintenance of monopoly power in violation of Section 2 by (1) disabling a feature in the iPod's third-party-supplied processing chip so that it does not play competitors' digital music files and (2) making its digital music files incapable of playback on other digital music players. (Opposition at 4.)

■ To state a claim for monopolization in violation of Section 2 of the Sherman Act, a plaintiff must allege that (1) the defendant possesses monopoly power in the relevant market, (2) the defendant has willfully acquired or maintained that power, and (3) the defendant's conduct has caused antitrust injury. *Cost Mgmt. Servs. v. Washington Natural Gas*, 99 F.3d 937, 949 (9th Cir.1996).

■ Here, Plaintiff has alleged that Apple took six actions to maintain its monopoly: (1) actively modifying the iPod's "core processor," the Portal Player System–On–A–Chip, not to support WMA; (2) actively modifying the iPod Shuffle's SigmaTel chip not to support WMA; (3) refusing to pay a nominal licensing fee for WMA; (4) using technological restrictions to prevent consumers who purchased music from rival stores from playing their music on their iPods; (5) selling music only using Apple's FairPlay DRM, which is incompatible with any digital music players other than iPod; and (6) using technological restrictions to prevent users from playing video files purchased from Apple on rival video-enabled music play-

ers. (Compl.¶¶ 16, 35–41.) Only the third of these allegations can be construed as a refusal to deal with Apple's competitor, Microsoft. As Plaintiff explains, there are numerous ways that Apple could make its iPod and digital music and video files interoperable with competing products: "It could, for example, modify the software that prevents Apple music and videos from playing on other portable music players, agree to allow other companies to sell music and videos on its iTunes software platform, license its own Fairplay DRM software, use an open-source DRM, use non-DRM copy protection software, use digital watermarks, or negotiate interoperability agreements." (Opposition at 5.) The Court finds that Plaintiff's allegations are not reducible to the single contention that Apple should license Microsoft's DRM. Nonetheless, the Court considers the two principal cases that Apple cites for the proposition that Plaintiff's claim is not cognizable under Section 2 of the Sherman Act: *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) and *Verizon Communications, Inc. v. Trinko*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004).

In *Aspen Skiing*, the plaintiff, owner of one of four major mountain facilities for downhill skiing in Aspen, Colorado, filed an action alleging Section 2 violations against defendant, which owned the other three facilities. 472 U.S. at 587–88, 105 S.Ct. 2847. In previous years, there had been only three major facilities operated by three independent companies. *Id.* Each company then offered its own daily use tickets and an interchangeable six-day all-Aspen ticket allowing access to all of the mountains; allocation of revenues was based on the relative use of each mountain. *Id.* at 589, 105 S.Ct. 2847. Defendant then acquired two of the three original facilities and opened a fourth. *Id.* at 588, 105 S.Ct. 2847. In addition to offering all-Aspen

tickets, defendant offered a weekly multiarea ticket that covered only its own mountains. The all-Aspen ticket outsold defendant's ticket. *Id.* at 590, 105 S.Ct. 2847. Defendant informed plaintiff that it would have to accept a fixed percentage of revenues (considerably lower than what plaintiff had been receiving under the survey method), or defendant would no longer agree to sell the all-Aspen ticket. *Id.* at 591, 105 S.Ct. 2847. When the plaintiff refused, the defendant discontinued its sale of the all-Aspen ticket, instead selling 6–day tickets featuring only its own mountains. *Id.* at 593, 105 S.Ct. 2847. Plaintiff's share of the market significantly declined. *Id.* Before the Supreme Court, defendant contended that even firms with monopoly power have no duty to engage in joint marketing with competitors and that none of its activities could be characterized as exclusionary within the meaning of Section 2. *Id.* at 600, 105 S.Ct. 2847.

The Supreme Court held that businesses have a qualified right to refuse to deal with competitors. *Id.* at 601, 105 S.Ct. 2847. The Court analyzed whether the defendant's conduct could properly be characterized as "exclusionary," that is, behavior which not only impairs rivals' opportunities, but does not further competition on the merits or does so in an unnecessarily restrictive way. *Id.* at 605, 105 S.Ct. 2847. Record evidence showed that elimination of the all-Aspen ticket had adversely affected consumers (among which the all-Aspen ticket had been very popular), the negative impact on defendant's sole competitor (plaintiff) was clear, and defendant had failed to offer any efficiency justification for its pattern of conduct. *Id.* at 604–609, 105 S.Ct. 2847.

The Supreme Court ultimately affirmed the determination of the lower courts that the defendant had violated Section 2 of the Sherman Act, concluding that the defendant, a monopolist who had decided to make an important change in market character, "was not motivated by efficiency concerns and that it was willing to sacrifice short-term benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610–12, 105 S.Ct. 2847. However, the Court did not explicitly limit its holding to cases in which competitors have a preexisting business relationship that one of them unilaterally terminates. Rather, the Court looked to the preexisting relationship in *Aspen Skiing* as evidence that the defendant acted to exclude competition rather than advance a legitimate business purpose. *Id.*

The Supreme Court further considered refusal to deal in *Trinko,* a 2004 case concerning the antitrust liability of telephone companies. The federal Telecommunications Act of 1996 requires incumbent local exchange carriers to share their network with competitors for local telephone service.[3] Incumbents may not enter the long-distance market without satisfying completion of a competitive checklist, including nondiscriminatory provision of network access to competitors. Verizon was a local exchange carrier subject to these requirements whose competitors alleged its noncompliance with statutory requirements. The Federal Communications Commission and New York's Public Services Commission imposed regulatory sanctions following an investigation. The plaintiff was a local telephone service customer of a Verizon competitor. It filed a putative class action against Verizon alleging that Verizon had violated Section 2 of the Sherman Act by not sharing its network with competitors as per its statutory duty. 540 U.S. at 401, 124 S.Ct. 872.

---

3. The Court held that nothing in the Telecommunications Act affected antitrust liability under the Sherman Act. 540 U.S. at 407–408, 124 S.Ct. 872.

As in *Aspen Skiing*, the Court acknowledged the general right of businesses to refuse to deal with their competitors, citing three reasons. First, businesses in a competitive market struggle to develop "an infrastructure that renders them uniquely suited to serve their customers." If, the antitrust laws imposed general liability for a refusal to deal, the incentive to develop such an infrastructure would be reduced. *Id.* at 407–408, 124 S.Ct. 872. Second, for antitrust courts to enforce sharing between competitors requires them "to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Id.* at 408, 124 S.Ct. 872. Lastly, "compelling negotiation between competitors may result in the supreme evil of antitrust: collusion." *Id.*

In *Trinko*, the Court noted that it had "found significance" in the defendant's decision to cease participation in a prior cooperative venture in *Aspen Skiing*. *Id.* at 409, 124 S.Ct. 872. However, the Court did not confine *Aspen Skiing* to cases in which a prior course of dealing exists. Rather, it focused on the defendant's prior conduct to "[shed] light upon the motivation of its refusal to deal—upon whether its regulatory lapses were prompted by 'competitive zeal' or 'anticompetitive malice.'" *Id.* There was no explanation for the defendant's refusal to continue along a previously profitable course of action in *Aspen Skiing* other than anticompetitive malice. In contrast, the Court found in *Trinko* that it was impossible to tell whether Verizon's reluctance to make its network available to competitors in the manner required under the Telecommunications Act was related to "dreams of monopoly." *Id.* Accordingly, the Court found that the plaintiff had no cognizable claim against Verizon. *Id.* at 410, 124 S.Ct. 872.

Applying *Aspen Skiing* and *Trinko* to this case: Plaintiff has alleged that Apple deliberately makes music sold at iTMS incompatible with its competitors' digital music players (Compl.¶ 14)—that is, Apple deliberately chooses to forego sales of digital media files at its asking price. Plaintiff also alleges that Apple deliberately makes the iPod unable to play music sold at its competitors' online music stores through the use of "crippleware." (Compl.¶¶ 15, 38.) The inference is that Apple deliberately foregoes iPod sales to prospective customers who have purchased digital media files from other vendors and want a digital media player on which they can place these files. By so doing, Plaintiff alleges that Apple has been able to charge iPod purchasers a supracompetitive price and has deterred iPod purchasers from even considering doing business with its music and video competitors. (Compl.¶¶ 54–55.) Plaintiff has alleged facts that, if proven, could establish that Apple was acting with "anticompetitive malice" rather than "competitive zeal" within the meaning of *Trinko* and *Aspen Skiing*.

 Apple has presented various business rationales for its product decisions; however, the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage. *SmileCare Dental Group v. Delta Dental Plan*, 88 F.3d 780, 786 (9th Cir.1996) Accordingly, the Court finds that Plaintiff has adequately alleged that Apple violated Section 2 of the Sherman Act.

### C. *Attempted Monopolization Claim*

Similar to the monopolization claim, Apple contends that under *Trinko*, Plaintiff cannot maintain an attempted monopolization claim because Apple's refusal to deal with Microsoft cannot be deemed anticompetitive. (Motion at 10.)

To state a claim for attempted monopolization in violation of Section 2 of the Sherman Act, a plaintiff must allege "(1) a specific intent to monopolize a relevant market—i.e., an intent to control prices or destroy competition in a relevant market; (2) predatory or anticompetitive conduct designed to control prices or destroy competition; (3) a dangerous probability of success—i.e., a probability of achieving monopoly power in the relevant market; and (4) causal antitrust injury." *Paladin Assocs.*, 328 F.3d at 1163 n. 22. In the Ninth Circuit, leveraging of a monopoly is not an independent Section 2 claim. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 (9th Cir.1991). However, "[i]f there is a dangerous probability that a monopoly will be created by leveraging conduct, then the conduct will be reached under the doctrine of attempted monopoly." *Id.* at 549.

First, Plaintiff has alleged that Apple deliberately made digital music purchased at iTMS inoperable with its competitors' digital music players, and made the iPod unable to play music sold at its rivals' online music stores—thus intentionally destroying other companies' ability to compete. (Compl.¶¶ 14, 15.) Second, Plaintiff has amply alleged anticompetitive conduct designed to destroy competition. (Compl. ¶¶ 12–16; 53–59.) Third, Plaintiff has alleged that Apple has, at the very least, a probability of achieving monopoly power in the relevant markets. (Compl.¶¶ 76–102.) Lastly, Plaintiff has clearly alleged injury to the consumer class that she seeks to represent. (Compl.¶¶ 53–59.) Accordingly, Plaintiff has adequately alleged the elements of an attempted monopolization claim.

### D. *Cartwright Act Claim and Common Law Monopolization Claim*

Plaintiff's Cartwright Act claim simply alleges that Apple's actions "consti-tuted an unreasonable restraint of trade or commerce throughout California and the rest of the United States in violation of the Cartwright Act..." (Compl.¶ 104.) The Cartwright Act has identical objectives to the federal antitrust acts, and cases construing the federal antitrust laws are permissive authority in interpreting the Cartwright Act. *Vinci v. Waste Mgmt., Inc.*, 36 Cal.App.4th 1811,1814 n. 1, 43 Cal.Rptr.2d 337 (1995). Typically, if a plaintiff can maintain a Sherman Act claim, he or she can maintain a similar Cartwright Act claim. However, the laws are distinct, and California courts have occasionally rejected federal precedent in construing the Cartwright Act. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 (9th Cir.1986).

Apple has presented no reason for the Court to dismiss the Cartwright Act claim or the common law monopolization claim while allowing Plaintiff's federal antitrust claims. The Court allows these claims to stand at this point.

## V. CONCLUSION

The Court DENIES Apple's Motion to Dismiss Plaintiff's anti-trust claims. The parties shall appear for a case management conference on January 22, 2007 at 10 A.M. Pursuant to the Civil Local Rules of the Court, the parties shall file a joint case management statement no later than ten (10) days before the date of the conference.