**NEW YORK MERCANTILE
EXCHANGE, INC.,**
Plaintiff,

v.

**INTERCONTINENTAL EXCHANGE,
INC., Defendant.**

No. 02 CIV. 9277(JGK).

United States District Court,
S.D. New York.

June 30, 2004.

See also 2003 WL 22281573.

**560**

Herbert C. Ross, Jr., Olshan, Grundman, Frome, Rosenzweig & Wolosky, LLP, New York, NY, for Plaintiff.

Anne L. Quintal, Winston & Strawn, LLP, Chicago, IL, Deborah Martinez, James H. Carter, Mark Edward Coyne, Michael A. Cheah, Phyllis Staub Wallitt, Richard H. Klapper, Sullivan & Cromwell, LLP, New York, NY, for Defendant.

Martin I. Kaminsky and Edward T. McDermott of Pollack & Kaminsky, New York, NY.

Shepard Goldfein, James A. Keyte and John H. Lyons of Skadden, Arps, Slate, Meagher & Flom, LLP, New York, NY.

### OPINION and ORDER

KOELTL, District Judge.

The plaintiff, New York Mercantile Exchange, Inc. ("NYMEX"), brings this action against the defendant, IntercontinentalExchange, Inc. ("ICE"), for copyright infringement, service mark infringement, dilution of the plaintiff's marks, and tortious interference with contract.

ICE has also filed counterclaims. Its First Amended Counterclaims allege four causes of action seeking certain declaratory relief and asserting that NYMEX engaged in monopoly maintenance and monopoly leveraging in violation of § 2 of the Sherman Act. ICE's first cause of action alleges that NYMEX has engaged in anticompetitive conduct to maintain its monopoly power in two relevant markets: (1) the market for intermediation services for cleared contracts for the purchase and sale of Henry Hub natural gas, and (2) the market for intermediation services for cleared contracts for the purchase and sale of West Texas Intermediate ("WTI") crude oil. ICE's second cause of action seeks a declaratory judgment that NYMEX's settlement prices for cleared contracts in these commodities are an essential facility and that ICE has the right to obtain, refer to, and use NYMEX's settlement prices on the same terms as other members of the public. ICE's third cause of action alleges, in the alternative, that if the Court finds that there are separate markets for the intermediation of futures contracts based on these commodities and for the intermediation of cleared over-the-counter ("OTC") contracts based on the same commodities, that NYMEX violated § 2 of the Sherman Act by leveraging its monopoly in the former market to gain an unlawful competitive advantage in the latter market. ICE's fourth cause of action seeks a declaratory judgment that NYMEX does not have a copyright in its settlement prices, or, alternatively, that NYMEX cannot enforce such a copyright against ICE, or that ICE has not infringed any such copyright.

NYMEX moves pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss ICE's First Amended

Counterclaims.[1] In its memorandum of law in opposition to this motion, ICE characterizes its § 2 counterclaims as follows: "NYMEX has violated Section 2 of the Sherman Act by (1) engaging in sham litigation and creating publicity of such litigation, and (2) attempting to deny ICE access to an essential facility." (ICE's Mem. Opp. Mot. Dismiss at 8.) At the argument of the motion, ICE conceded that it could not prevail on its claim alleging sham litigation and accompanying publicity, and it agreed to withdraw the claim. (Transcript of Hearing dated June 7, 2004 ("Tr.") at 38.) Also at the argument of the motion, ICE asserted that its allegations comport with the § 2 refusal-to-deal claims recognized by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), and *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

## I

■ On a motion to dismiss a counterclaim, the allegations in the counterclaim are accepted as true. *See Universal Acupuncture Pain Services, P.C. v. State Farm Mutual Automobile Ins. Co.*, 196 F.Supp.2d 378, 382 (S.D.N.Y.2002); *see also Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). In deciding a motion to dismiss a counterclaim, all reasonable inferences must be drawn in the counterplaintiff's favor. *See Universal Acupuncture*, 196 F.Supp.2d at 382; *see also Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, NYMEX's present motion should be granted only if it appears that ICE can prove no set of facts in support of its claims that would entitle ICE to relief. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Grandon*, 147 F.3d at 188; *Goldman*, 754 F.2d at 1065.

■ In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may consider documents that are referenced in the counterclaims, documents that the counterplaintiff relied on in bringing suit and that are either in the counterplaintiff's possession or that the counterplaintiff knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.* 282 F.3d 147, 153 (2d Cir. 2002); *see also Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991); *Skeete v. IVF America, Inc.*, 972 F.Supp. 206, 208 (S.D.N.Y.1997); *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F.Supp.2d 435, 437 (S.D.N.Y.2001). However, "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the [counter]plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of the Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (quoting *Poller v. Columbia Broad.*, 368

---

1. For the reasons explained below in the text, the motion can be decided solely on the basis of Rule 12(b)(6), and the Court need not reach the arguments that NYMEX makes under Rule 12(b)(1). NYMEX's motion does not address ICE's fourth cause of action relating to NYMEX's copyright claim to its settlement prices, and therefore that cause of action cannot be dismissed.

U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)).

## II

ICE's First Amended Counterclaims allege the following relevant facts. NYMEX is a Designated Contract Market—the statutory term for a regulated futures exchange—that is subject to the Commodity Exchange Act ("CEA") and the jurisdiction of the Commodity Futures Trading Commission ("CFTC"). (First Amended Counterclaims ("FAC") ¶ 8.) NYMEX operates as an "open-outcry" system, in which brokers and traders transact with each other by physical communications on a physical trading "floor." (FAC ¶¶ 8–9.)

NYMEX is the only Designated Contract Market that offers an active trading market for North American natural gas and crude oil futures contracts, among other commodities. (FAC ¶ 9.) Two of NYMEX's most successful futures contracts are its Henry Hub natural gas and WTI crude oil contracts. (FAC ¶ 10.) NYMEX's Henry Hub contract, which provides for delivery of natural gas at the Henry Hub natural gas pipeline in Louisiana, is the only actively traded natural gas futures contract in the United States. (FAC ¶ 10.) Similarly, the only actively traded crude oil futures contract in the United States is the NYMEX contract based on WTI light sweet crude oil, which provides for delivery in Oklahoma. (FAC ¶ 10.)

The Henry Hub natural gas and WTI crude oil contracts traded on NYMEX, like other futures contracts on physical commodities, provide for the purchase and sale of the underlying commodity at an agreed-upon price in a specified delivery month. (FAC ¶ 11.) Although physical delivery is possible under a futures contract, only a very small percentage of futures contracts traded on NYMEX result in physical delivery. (FAC ¶ 12.) In most cases, each party enters into an equal and offsetting transaction for the same contract prior to delivery, thereby liquidating the original contract and obviating the need for physical delivery. (FAC ¶ 12.)

Futures contracts are executed on the floor of the exchange, or through an electronic trading system, by the matching of buyers and sellers wishing to transact in the same quantities and at the same prices. (FAC ¶ 13.) Once a match occurs, a transaction is automatically novated to the NYMEX clearing house, which interposes itself between the original parties and becomes the buyer to every seller and the seller to every buyer. (FAC ¶ 13.) The clearing house thus assumes the credit risk of each party to the transaction by effectively guaranteeing each party's performance obligations. (FAC ¶ 13.) Each party must deposit initial margin, which serves as a "performance bond" to secure its performance under the contract. (FAC ¶ 13.) On each day that the contract remains open, each party pays or receives additional variation margin based on changes in the value of the contract. (FAC ¶ 13.) The changes in the value of the contract are determined by reference to the settlement prices each day. (FAC ¶ 13.)

The settlement prices for Henry Hub natural gas and WTI crude oil futures contracts are determined by NYMEX's "settlement committee" at the end of each trading day. (FAC ¶ 15.) After NYMEX's floor closes at 2:30 p.m. each day, the trades executed during the closing range, which is usually the five minutes of trading prior to the close, are tabulated and circulated to the members of the settlement committee. (FAC ¶ 15.) The settlement committee then determines the NYMEX market price pursuant to the NYMEX Exchange Rules, a process that ICE alleges is mechanical and formulaic,

not creative or original. (FAC ¶ 15.). NY-MEX is alleged to have consistently represented that its settlement prices reflect actual trading activity and are not produced by NYMEX. (FAC ¶ 16.)

NYMEX's settlement prices play an important role in the economy by disclosing the market price for various commodities. (FAC ¶ 18.) The CEA requires that NY-MEX report its settlement prices, among other data, to the public. (FAC ¶ 18.) NYMEX makes its settlement prices available to the public on an almost instantaneous basis by reporting them on its website and transmitting them to its "market data vendors"—third parties to whom NYMEX has granted worldwide, non-exclusive licenses to redistribute NYMEX market data. (FAC ¶ 19.) Some market data vendors provide NYMEX market data to their subscribers for a fee, while others provide the data to the public at no charge and with no restrictions. (FAC ¶ 19.) Members of the public can obtain settlement prices for free and without restriction from publicly accessible websites and in various national newspapers. (FAC ¶ 19.)

NYMEX does restrict the use of its settlement prices when subscribers receive the data on a "real time" basis, which is generally within thirty minutes of the data's release by NYMEX. (FAC ¶ 20.) NYMEX requires that subscribers who receive the settlement prices on a real-time basis enter into a "uniform subscriber addendum," which purports to limit the subscriber's use of NYMEX's real-time market data to its own "internal" business use and requires the subscriber to agree not to use NYMEX's real-time prices in competition with NYMEX. (FAC ¶ 20.) NYMEX does not impose these restrictions on subscribers who receive data on a "delayed" basis, which is generally one half hour after its release by NYMEX. (FAC ¶ 20.)

Because NYMEX is the only Designated Contract Market that offers an active trading forum for Henry Hub natural gas and WTI crude oil, trading liquidity for these contracts is concentrated on NYMEX, and NYMEX's settlement prices for these contracts have gained acceptance as the market prices for the underlying commodities. (FAC ¶ 21.) Third-party market participants thus use NYMEX settlement prices in transactions executed outside of NY-MEX because NYMEX prices are considered benchmarks and because NYMEX has actively encouraged third parties to use its prices. (FAC ¶ 23.) For example, NYMEX encouraged the International Swaps and Derivatives Association ("ISDA") to adopt the NYMEX settlement prices for Henry Hub natural gas and WTI crude oil as price references in standard form ISDA contracts, which are widely used in over-the-counter ("OTC") transactions. (FAC ¶ 23.) NYMEX allegedly encouraged the adoption of its prices as standard terms in ISDA's forms, but has never licensed ISDA to use NYMEX's name or to refer to NYMEX's settlement prices. (FAC ¶ 24.) NYMEX is also alleged to be aware that participants in OTC transactions use and reference NYMEX prices in their agreements and when marking their positions to market. (FAC ¶ 25.) Other futures exchanges, including the Goldman Sachs Commodity Index on the Chicago Mercantile Exchange, also use NYMEX settlement prices to settle and clear certain contracts that they offer for trading, and NYMEX has allegedly never objected to these uses of its settlement prices or required the relevant parties to license their use. (FAC ¶ 26.)

As an alternative to purchasing and selling futures contracts, market participants may enter into off-exchange OTC transactions to purchase or sell the same underlying commodities. (FAC ¶ 27.) OTC transactions serve the same purposes as

futures contracts because they allow parties to hedge against or speculate on the prices of the relevant commodities. (FAC ¶ 27.) Market participants have traditionally engaged in telephone negotiations to enter into OTC transactions that are then memorialized on a master agreement and a related confirmation. (FAC ¶ 28.) The parties in such instances deal directly with each other and are responsible for all aspects of the settlement of the transaction, including payment, delivery, and credit terms. (FAC ¶ 28.) Parties to OTC contracts may also execute their transactions through "voice brokers," who act as intermediaries and allow parties to find counterparties more efficiently. (FAC ¶ 28.) OTC contracts, like futures contracts, may be settled through offsetting contracts, rather than delivery, and many OTC contracts by their terms provide for settlement through cash payments rather than delivery. (FAC ¶ 29.)

Traditional OTC contracts are nonetheless distinct from futures contracts in a number of respects. (FAC ¶ 30.) Futures contracts are executed on a regulated exchange and may be traded by any market participant, including members of the general public. (FAC ¶ 30.) OTC contracts, by contrast, are traded outside regulated exchanges and are entered into between commercial and institutional entities. (FAC ¶ 30.) The most significant difference between futures contracts and traditional OTC contracts is that futures contracts are always cleared through a central clearing house, while OTC contracts generally have been settled bilaterally between the parties to the transactions, without any centralized clearing. (FAC ¶ 30.)

ICE was organized in 2000 to operate an Internet-based, electronic trading platform for OTC transactions in physical commodities and derivative products based on such commodities. (FAC ¶ 31.) ICE's electronic platform, which can be accessed through ICE's website, provides eligible participants with the ability to post bids and offers for transactions in a variety of products and to execute transactions against bids and offers posted by other participants. (FAC ¶ 31.) All of the participants on ICE's trading platform are required to be "eligible commercial entities" under the CEA, which defines the term to include commercial and institutional market participants that satisfy certain requirements. (FAC ¶ 32.)

ICE's goal is to provide participants in the OTC commodity markets with a more efficient means of trading. (FAC ¶ 33.) ICE allows market participants to trade with each other through an electronic platform, rather than through bilateral telephone negotiations or the use of voice brokers. (FAC ¶ 33.) From the commencement of trading on ICE in October 2000 through March 2002, ICE offered market participants an "execution only" facility, with no clearing alternative. (FAC ¶ 34.) Participants would post bids and offers and be matched according to time and price, and once the parties executed a transaction they were responsible for all settlement and clearing functions. (FAC ¶ 34.) At that point, ICE had no further role in the transaction. (FAC ¶ 34.)

Like ISDA and others in the OTC industry, ICE has referenced NYMEX contracts in its description of the products traded on its electronic platform since it commenced trading in October 2000. (FAC ¶ 35.) NYMEX contracts allegedly serve as the benchmark for both price and contract specifications, which market participants use when entering into most of their transactions. (FAC ¶ 35.) Market participants are therefore unwilling to trade an OTC Henry Hub or WTI contract unless its terms refer to NYMEX settlement prices. (FAC ¶ 35.)

OTC contracts have generally not been cleared, because parties to OTC contracts typically settled their transactions bilaterally, with each party responsible for its own performance and each party exposed to the risk of the other party's non-performance. (FAC ¶ 36.) ICE alleges that, in the past three years, especially following the collapse of Enron Corporation, market participants have been increasingly concerned with counterparty credit risk, and they have begun to demand OTC intermediation services that substantially reduce or eliminate direct counterparty credit risk. (FAC ¶ 37.) ICE alleges that, as a result of these developments, many participants in the OTC market demanded that providers of OTC intermediation services offer clearing as an alternative. (FAC ¶ 37.)

In 2001, ICE entered into an agreement with the London Clearing House ("LCH") to provide ICE participants with the opportunity to clear cash-settled OTC transactions executed on ICE in the Henry Hub natural gas "fixed for floating swap" and the WTI crude oil "bullet swap." (FAC ¶ 38.) The terms of these two contracts are substantially similar to NYMEX's futures contracts on Henry Hub natural gas and WTI crude oil. (FAC ¶ 38.) ICE's contractual arrangement and data connections with LCH allow ICE to provide its participants with both execution and clearing services that result in cleared OTC transactions. (FAC ¶ 39.) ICE alleges that, from the perspective of market participants, these contracts are considered economic substitutes of the NYMEX futures contracts based on the same commodities because both hedge the same price risks and eliminate counterparty credit risk. (FAC ¶ 39.)

A cleared contract must be marked-to-market on the basis of the market price for the underlying commodity. (FAC ¶ 40.) Because the prices of NYMEX's Henry Hub natural gas and WTI crude oil futures contracts are accepted benchmark prices for those commodities, ICE alleges that it must take these prices into account when it determines the prices at which ICE's cleared OTC contracts based on those commodities settle and clear. (FAC ¶ 40.) In determining its own settlement prices, ICE's settlement committee reviews both the NYMEX settlement prices, which it receives lawfully from a licensed market data vendor after the prices are made available to the public, as well as certain trading activity on ICE. (FAC ¶ 41.) Because NYMEX's prices are generally accepted as the market prices for Henry Hub natural gas and WTI crude oil, ICE's settlement prices are generally substantially similar to the NYMEX settlement prices. (FAC ¶ 41.) At maturity, a transaction executed on ICE and cleared through LCH is settled at the corresponding NYMEX settlement price. (FAC ¶ 42.) Market participants generally require this procedure because the NYMEX settlement price is the industry benchmark, and because virtually all other OTC transactions in the energy market are settled against this price. (FAC ¶ 42.) ICE alleges that if it did not finally settle its cleared contracts against the NYMEX price, the contracts would have little value to market participants, because even a small discrepancy results in the introduction of unacceptable "basis risk," which is the risk of incorrectly matching offsetting transactions. (FAC ¶ 42.)

## III

ICE alleges that these facts state claims for violations of § 2 of the Sherman Act. Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign na-

tions . . . ." 15 U.S.C. § 2. Private parties are granted the right to sue for, and seek injunctive relief against, violations of the antitrust laws by § 4 and § 16 of the Clayton Act. 15 U.S.C. §§ 15, 26. ICE asserts claims of monopoly maintenance and monopoly leveraging against NYMEX.

ICE alleges that NYMEX has long recognized the threat of electronic trading, and that when ICE began trading OTC contracts in late 2000 NYMEX viewed ICE as an emerging competitor. (FAC ¶¶ 43–44.) ICE further alleges that in December 2001, when ICE announced that it would begin trading cleared OTC contracts, NYMEX realized that ICE had become a direct competitor in the same market for which NYMEX operated. (FAC ¶ 44.) ICE alleges that because both ICE and NYMEX charge a fee for transactions executed through them, decisions by market participants to execute and clear contracts through ICE, rather than through NYMEX, reduces NYMEX's revenues. (FAC ¶ 44.)

ICE alleges that NYMEX has responded to ICE's competition by threatening to prevent ICE from using NYMEX's settlement prices, and by publicizing NYMEX's claims to copyright protection in the settlement prices and this copyright infringement action, all in an alleged effort to cast doubt on ICE's future ability to use NYMEX settlement prices. (FAC ¶ 45.) ICE further alleges that in November 2002, just more than a week before NYMEX filed its complaint in this action, NYMEX announced that it would begin offering new contracts on its prior electronic platform, NYMEX ACCESS, that were designed to appeal to OTC market participants. (FAC ¶ 60.) ICE alleges that these contracts included contracts that resemble popular OTC contracts such as "swaps" based on the NYMEX price for Henry Hub natural gas and WTI crude oil, but that are actually exchange-traded futures contracts that are indistinguishable from the futures contracts already traded on NYMEX. (FAC ¶ 60.) In January 2003, NYMEX launched a new electronic platform, ClearPort, on which NYMEX's OTC-like contracts are now traded. (FAC ¶ 60.) ICE alleges that NYMEX took these actions to undermine the credibility and long-term viability of ICE's electronic platform in the eyes of market participants. (FAC ¶ 61.) ICE alleges that it has been harmed by NYMEX's actions because customers who might otherwise use ICE's services have turned elsewhere, in particular to NYMEX. (FAC ¶ 61.)

ICE alleges that the relevant markets for its antitrust claims are (1) the market for the intermediation of cleared contracts for the purchase and sale of Henry Hub natural gas, and (2) the market for the intermediation of cleared contracts for the purchase and sale of WTI crude oil. (FAC ¶ 62.) ICE alleges that the customers for these markets are located worldwide. (FAC ¶ 62.) ICE alleges that both ICE and NYMEX are intermediaries in transactions in Henry Hub natural gas and WTI crude oil, because they each provide a forum in which market participants can execute transactions based on these commodities. (FAC ¶ 63.) ICE alleges that NYMEX's forum is principally an open-outcry exchange, while ICE's forum is an Internet-based matching system, and that both NYMEX and ICE charge fees for contracts executed on their forums as well as fees for clearing those contracts (which fees are paid to LCH when the contracts are executed on ICE). (FAC ¶ 63.)

ICE alleges that futures and cleared OTC contracts are fungible economic substitutes. (FAC ¶ 64.) Both are contracts to purchase or sell a specified quantity of a commodity at an agreed-upon price in the future, and both therefore allow parties to the contracts to hedge or assume price

risks. (FAC ¶ 64.) Both futures and cleared OTC contracts are cleared through a clearing house that acts as a counterparty in every transactions and thus obviates the risk of non-performance by a counterparty. (FAC ¶ 64.) By contrast, bilateral OTC contracts, according to ICE, are different from futures and cleared OTC contracts, because bilateral OTC contracts are not cleared through a clearing house and thus expose market participants to counterparty credit risk. (FAC ¶ 64.)

ICE alleges that NYMEX possesses monopoly power in both relevant markets, that ICE and NYMEX are the only two competitors in the relevant markets, and that there are substantial barriers to entry into the relevant markets. (FAC ¶ 67–68.) ICE also alleges that there are a number of barriers to entry to the relevant markets, because entrants incur significant capital costs in developing and operating an Internet-based trading platform, because entrants incur contracting costs in developing a relationship with one of the few clearing houses in the industry, and because entrants must demonstrate that their contracts and intermediation services will satisfy market participants' risk management needs. (FAC ¶ 70–72.) ICE alleges that a market participant's risk management needs can be met only if the entrant settles and clears its contracts at the market price for the given commodity. (FAC ¶ 72.) Because a new entrant will not have sufficient liquidity on its trading platform, ICE alleges that a new entrant is not able to determine its own prices based solely on its own trading. (FAC ¶ 72.) ICE alleges that this "network effect" raises a substantial barrier to any prospective entrants to the relevant markets. (FAC ¶ 72.)

ICE alleges that these barriers to entry allow NYMEX to control prices and restrict or eliminate competition. (FAC ¶ 73.) ICE alleges that a new entrant could mitigate the network effect between market prices and liquidity by referring to established market prices, which for the relevant markets are NYMEX's settlement prices for Henry Hub natural gas and WTI crude oil. (FAC ¶ 74.) ICE thus alleges that these conditions make NYMEX's settlement prices for Henry Hub natural gas and WTI crude oil an essential facility. (FAC ¶ 75.) ICE alleges that the market prices for these commodities, which NYMEX reports, cannot be reasonably duplicated, and that competitors must be permitted to use NYMEX's settlement prices if they are to compete in the relevant markets. (FAC ¶ 75.)

NYMEX moves pursuant to Rule 12(b)(6) to dismiss ICE's antitrust counterclaims for failure to state a claim upon which relief can be granted.

### A

ICE's first cause of action alleges that NYMEX has engaged in conduct designed to maintain its monopoly in the following relevant markets: (1) the market for intermediation services for cleared contracts for the purchase and sale of Henry Hub natural gas, and (2) the market for intermediation services for cleared contracts for the purchase and sale of WTI crude oil.

To make out a monopolization claim under § 2 of the Sherman Act, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *see also Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 61 (2d Cir.1997). ICE alleges that NYMEX has violated § 2 by (1) engaging in sham litigation and creating pub-

licity of such litigation, and (2) attempting to deny ICE the use of an essential facility. (FAC ¶ 3; ICE's Mem. Opp. Mot. Dismiss at 8.) As explained above, ICE withdrew its § 2 sham litigation claim at the argument of the motion. Also at the argument of the motion, ICE asserted that it has stated viable § 2 claims under the Supreme Court's decisions in *Aspen Skiing* and *Otter Tail*, as well as under the essential facilities doctrine.

■ The elements of an essential facility claim under § 2 are: " '(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.' " *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569 (2d Cir.1990) (quoting *MCI Communications Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132–33 (7th Cir.1983)). NYMEX contends that ICE has failed adequately to allege the first two elements of an essential facility claim.

In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), which reached the Supreme Court on a motion to dismiss, the Court explained some of the constraints imposed on the essential facility doctrine. First, the Court emphasized that the "mere possession of monopoly power, and the concomitant charging of monopoly prices," does not constitute anticompetitive conduct that would establish the second element of a § 2 monopolization claim. *Trinko*, 540 U.S. at ——, 124 S.Ct. at 879. Because this requirement preserves the opportunity to charge monopoly prices, if only for a short period, it also preserves inducements to innovate and apply business acumen. *See id.* For similar reasons, monopolists are generally permitted by the Sherman Act to choose those with whom they will

deal. *Id.* (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2," but the Supreme Court has been "very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id.*

The Supreme Court in *Trinko* rejected the determination by the Court of Appeals for the Second Circuit that the plaintiff had made out an essential facilities claim. *Id.* 124 S.Ct. at 880–81. The Supreme Court noted that it had never recognized or rejected the essential facilities doctrine, but that to the extent such a doctrine exists, the plaintiff's allegations concerning Verizon's provision of services to rivals did not make out an essential facilities claim. "It suffices for present purposes to note that the indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose. Thus, it is said that 'essential facility claims should ... be denied where a state or federal agency has effective power to compel sharing and regulate its scope and terms.' " *Id.* at 881 (quoting P. Areeda & H. Hovenkamp, Antitrust Law, p. 150, ¶ 773e (2003 Supp.)). Under the circumstances in *Trinko*, "the 1996 [Telecommunications] Act's extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access." *Id.*

■ So, too, in this case, where access to the alleged "essential facility" is regulated by the CFTC, a federal agency with effective power to compel sharing of NYMEX's settlement prices and regulate the scope and terms of such sharing. When asked by the Court at the argument of the motion whether the CFTC has the power

under the CEA to regulate the use to which NYMEX's settlement prices can be put by others, ICE's counsel responded, "I think they do, frankly." (Tr. 42.) Indeed, various provisions of the CEA require exchanges—which are designated "contract markets" under the Act—to disclose information, including settlement prices, in a prescribed fashion. Section 6g(e) of the CEA requires: "Before the beginning of trading each day, the exchange shall, insofar as is practicable and under terms and conditions specified by the Commission, make public the volume of trading on each type of contract for the previous day and such other information as the Commission deems necessary in the public interest and prescribes by rule, order, or regulation." 7 U.S.C. § 6g(e). Section 7(d) of the CEA sets forth "core principles" with which designated contract markets such as NYMEX must comply in order to maintain their designation as contract markets. *See* 7 U.S.C. § 7(d)(1). Core Principle 8 provides that a designated contract market "shall make public daily information on settlement prices, volume, open interest, and opening and closing ranges for actively traded contracts on the contract market." 7 U.S.C. § 7(d)(8).

Through regulation, the CFTC has provided that contract markets must make their settlement prices "readily available to the news media and the general public no later than the business day following the day to which the [settlement prices] pertain[ ]." 17 C.F.R. § 16.01(b)(2). The CFTC's "application guidance" for compliance with Core Principal 8 states that "[a] contract market should provide to the public information regarding settlement prices ..., as determined by the Commission, on a fair, equitable and timely basis." 17 C.F.R. Pt. 38, App. B, Core Principle 8.

The CEA also provides that, before promulgating regulations under the Act, the CFTC should consider the costs and bene-

fits of the CFTC's action as well as any implications for the antitrust laws. 7 U.S.C. § 19. Section 19(a) of the CEA provides that the costs and benefits of CFTC action must be evaluated in light of, among other factors, "protection of market participants and the public"; "the efficiency, competitiveness, and financial integrity of futures markets"; and "price discovery." 7 U.S.C. § 19(a)(2). Section 19(b) requires that the CFTC "take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means of achieving the objective of this chapter" when the CFTC adopts rules and regulations or issues orders under the CEA. 7 U.S.C. § 19(b).

Given the CFTC's authority to regulate the scope and terms of access to NYMEX's settlement prices, ICE cannot make out a claim under the essential facilities doctrine. As the Supreme Court explained in *Trinko,* "where access exists, the [essential facility] doctrine serves no purpose," and essential facility claims should be denied "where a state or federal agency has effective power to compel sharing and regulate its scope and terms." *Trinko,* 540 U.S. at ——, 124 S.Ct. at 881 (internal quotation marks and citation omitted). This result is based, as the Court observed in *Trinko,* on the sound reasons that exist for leaving it to regulatory agencies, rather than antitrust courts, to regulate the terms of any forced access. As the Court noted, "[e]nforced sharing ... requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko,* 540 U.S. at ——, 124 S.Ct. at 879.

Indeed, while the Supreme Court indicated in *Trinko* that the essential facility doctrine "serves no purpose" where access exists, ICE does not deny that it has access to NYMEX's settlement prices. At argument, ICE candidly conceded that it had access to the data: "We have access to the data." (Tr. 40.) It concedes it has access to the data, and there are lots of sources of the data. Its complaint is the uses to which it can put the data to which it unquestionably has access, but under *Trinko*, that is not a viable essential facility claim.

Moreover, the CFTC, under the terms of the CEA, is also charged with making rules and regulations that take into consideration the interests of the antitrust laws and, among other things, "the efficiency, competitiveness, and financial integrity of futures markets." 7 U.S.C. §§ 19(a)(2)(B). The Court in *Trinko* instructed that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Trinko*, 540 U.S. at ——, 124 S.Ct. at 881. "One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny." *Id.* Here, not only does the CFTC regulate the dissemination of settlement prices, which are alleged to be an essential facility, but it must design its rules and regulations after taking into consideration the competitiveness of the futures markets and the interests of the antitrust laws generally. Because the CFTC has the authority to regulate the scope and terms of access to NYMEX's settlement prices, the essential facilities doctrine serves no purpose in the circumstances of this case. Furthermore, the CFTC is in a better position than a general antitrust court to determine the scope and terms of any forced sharing of settlement prices among the exchanges that it regulates, and then to oversee and enforce any such sharing of settlement prices. Because ICE has failed to make out a claim under the essential facilities doctrine, the counterclaim must be dismissed.

B

As explained above, at the argument of the motion, ICE asserted that its monopolization claims also fall under the category of claims recognized by the Supreme Court in *Aspen Skiing* and *Otter Tail*. These two cases were not cited, much less argued, in ICE's brief in opposition to NYMEX's motion to dismiss. They could hardly be construed as an independent basis for a claim, and any such argument would be waived. But, in any event, the arguments have no merit.

Though the Supreme Court in *Aspen Skiing* found § 2 liability based on a refusal to deal with a rival, the Court in *Trinko* instructed that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at ——, 124 S.Ct. at 879. In *Aspen Skiing*, the defendant owned three of the four mountains that made up the Aspen downhill skiing market, and the plaintiff owned the fourth mountain. For a number of years, the defendant and the plaintiff had cooperated in marketing a joint ticket to skiers that provided admission to all four mountains. *Aspen Skiing*, 472 U.S. at 590–91, 105 S.Ct. 2847. The defendant repeatedly and unsuccessfully demanded a larger share of the proceeds from the joint ticket, and eventually refused to continue the cooperative arrangement. *Id.* at 591–93, 105 S.Ct. 2847. The plaintiff tried to market its own multimountain ticket to replace the joint ticket, and even offered to buy the defendant's tickets at retail price, an offer the defen-

dant rejected. *Id.* at 593–94, 105 S.Ct. 2847. The Supreme Court observed that: [T]he monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor. Rather the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years.

*Id.* at 603, 105 S.Ct. 2847. The Court also noted that "it seems appropriate to infer that such [joint] tickets satisfy consumer demand in free competitive markets"— that is, that competition in the Aspen skiing market required some level of cooperation, because consumers demanded it. *Id.* Because the defendant's cooperation with the plaintiff would have entailed no cost to the defendant and indeed would have provided it with immediate benefits, and because consumers preferred the cooperative arrangement, the only apparent justification for the defendant's refusal to deal was anticompetitive malice: "Thus the evidence supports an inference that [the defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610–11, 105 S.Ct. 2847.

■ The allegations of a refusal to deal in this case do not fit "within the limited exception recognized in *Aspen Skiing.*" *Trinko*, 540 U.S. at ——, 124 S.Ct. at 880. The course of conduct by the defendant in *Aspen Skiing* that raised an inference of anticompetitive conduct is not present in this case. There is no history of cooperation between ICE and NYMEX in sharing the use of NYMEX's settlement prices. Therefore, NYMEX's "prior conduct sheds no light upon the motivation of its refusal to deal." *Id.* There is no indication that NYMEX is flouting consumer demand and foregoing short-term profits by refusing to

cooperate with ICE. And unlike the defendant in *Aspen Skiing*, NYMEX has proffered a legitimate business justification for its refusal to deal with ICE. (Tr. 21–23.) NYMEX has a legitimate business interest in preventing its competitor, ICE, from free-riding on NYMEX's settlement prices. NYMEX's settlement prices have value because they are viewed as proxies for market prices, and NYMEX has a legitimate interest in preventing rivals from free-riding on this reputation. In any event, because the indicia of anticompetitive conduct that the Supreme Court located in *Aspen Skiing* are not present in the facts alleged in this case, ICE's § 2 claims of a refusal to deal do not fit the rubric of claims recognized by the Supreme Court in *Aspen Skiing.*

The other case that ICE invoked at oral argument is *Otter Tail*, although ICE provided no specific arguments about how the allegations in this case would state a § 2 claim under *Otter Tail.* Indeed, it is plain for several reasons that this is not an *Otter Tail* case. In *Otter Tail*, the Supreme Court found that the defendant—a private, highly-regulated utility company with monopoly power in the wholesale power market—had "sought to substitute for competition anticompetitive uses of its dominant economic power." *Otter Tail*, 410 U.S. at 380, 93 S.Ct. 1022. The defendant utility sold electric power at retail in Midwestern towns under short-term municipally granted franchises. Because each town could accommodate only one power distribution system, each town formed a natural monopoly for the retail sale of electric power. When faced with efforts by the towns to displace the defendant with their own municipal distribution systems, the defendant engaged in such wrongful conduct as refusing to sell power to the towns at wholesale and refusing to "wheel," or transfer, power to the towns along its transmission lines, which were the only lines available,

from other wholesalers. *Id.* at 369–71, 93 S.Ct. 1022. The Supreme Court affirmed the district court's finding that "Otter Tail's refusals ... to wheel were solely to prevent municipal power systems from eroding its monopolistic position." *Id.* at 378, 93 S.Ct. 1022.

The allegations in this case do not fit the rubric of *Otter Tail.* NYMEX is not alleged to possess a natural monopoly, as the defendant possessed in *Otter Tail.* The allegations in this case also do not raise an inference that NYMEX's refusal to deal with ICE was animated "solely" by an exclusionary purpose. As explained above, NYMEX has a legitimate interest in preventing competitors from free riding on its settlement prices. Most significantly, however, this case differs from *Otter Tail* in that the Supreme Court there found that the Federal Power Commission, the applicable regulatory agency, lacked the authority to order the defendant to wheel the power, and thus break the bottleneck created by the defendant's monopoly of the transmission lines. *See id.* at 375–76, 93 S.Ct. 1022. As explained above, the CFTC has the power to compel disclosure of the settlement prices and to regulate the scope and terms of such disclosure. For these reasons, *Otter Tail* provides no assistance to ICE.

Therefore, ICE has failed to make out a monopolization claim under § 2 of the Sherman Act, and its first counterclaim for monopoly maintenance is dismissed.[2]

### C

■ ICE's monopoly leveraging claim, its third counterclaim, is pleaded in the alternative in the event the Court determines that there are separate markets for the intermediation of futures contracts and for the intermediation of cleared OTC contracts in Henry Hub natural gas and WTI crude oil. The standard in the Second Circuit for a monopoly leveraging claim has been that the plaintiff must establish that the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage ... in another distinct market; and (3) caused injury by such anticompetitive conduct." *Virgin Atl. Airways v. British Airways,* 257 F.3d 256, 272 (2d Cir.2001). However, the Supreme Court in *Trinko* held that this standard was erroneous to the extent it "dispensed with a requirement that there be a 'dangerous probability of success' in monopolizing a second market." *Trinko,* 540 U.S. at —— n. 4, 124 S.Ct. at 883 n. 4 (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).

In this case, ICE alleged that NYMEX used its monopoly power in the market for intermediation of futures contracts to gain an "unlawful competitive advantage" in the separate market for intermediation of cleared OTC contracts. (FAC ¶ 90.) At the time the counterclaims were asserted, a monopoly leveraging claim could be made out in this Circuit by alleging that the defendant used its monopoly power in one market to gain an unlawful "competitive advantage" in another distinct market. But the Supreme Court has made clear that a monopoly leveraging claim must allege that there was a "dangerous probability of success" in the defendant's attempt to monopolize the second market.

---

**2.** Because ICE's second counterclaim seeks a declaratory judgment that NYMEX's settlement prices are an essential facility, which, for the reasons explained in the text, they are not, that counterclaim is dismissed. However, NYMEX has not made any arguments in this motion that would support dismissing ICE's fourth counterclaim, which seeks a declaratory judgment that NYMEX does not have a copyright in its settlement prices, or, alternatively, that NYMEX cannot enforce such a copyright against ICE, or that ICE has not infringed any such copyright. Therefore, ICE's fourth counterclaim is not dismissed.

ICE's counsel conceded at the argument of the motion that this claim is "dead in the water" after *Trinko,* and ICE voluntarily withdrew the claim.[3] (Tr. 37.)

## CONCLUSION

For the reasons explained above, NY-MEX's motion to dismiss ICE's First Amended Counterclaims is granted with respect to ICE's first, second, and third counterclaims.

**SO ORDERED.**

---

3. Because ICE's antitrust counterclaims are either voluntarily withdrawn or dismissed for failure to state a claim, there is no need to reach NYMEX's alternative arguments con-cerning implied repeal, antitrust standing, failure to allege harm to competition, and insufficiency of the alleged relevant markets.