NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1242, -1243

DIGENE CORPORATION,

Plaintiff-Appellant,

v.

THIRD WAVE TECHNOLOGIES, INC.,

Defendant-Cross Appellant.

William K. West, Jr., Howrey LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Gregory L. Baker and Jerrold J. Ganzfried. Of counsel was Peter A. Barile, III. Of counsel on the brief were Christine A. Dudzik, of Chicago, Illinois and Richard L. Stanley, of Houston, Texas.

Mark A. Pals, P.C., Kirkland & Ellis LLP, of Chicago, Illinois, argued for defendant-cross appellant. With him on the brief were Christopher R. Liro and Matthew J. Shiels. Of counsel was Chong S. Park, of Washington, DC. Of counsel on the brief were Kathleen M. Sullivan and Daniel H. Bromberg, Quinn Emanuel Urquhart Oliver & Hedges, LLP, of Redwood Shores, California.

Appealed from: United States District Court for the Western District of Wisconsin

Chief Judge Barbara B. Crabb

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1242, -1243

DIGENE CORPORATION,

Plaintiff-Appellant,

v.

THIRD WAVE TECHNOLOGIES, INC.,

Defendant-Cross Appellant,

Appeals from the United States District Court for the Western District of Wisconsin in Case No. 07-CV-22, Chief Judge Barbara B. Crabb.

_____

DECIDED: April 1, 2009

_____

Before LOURIE, RADER, and PROST, Circuit Judges.

LOURIE, Circuit Judge.

Digene Corporation ("Digene") appeals from the judgment of the United States District Court for the Western District of Wisconsin holding that Third Wave Technologies, Inc. ("Third Wave") did not infringe the Digene patent in suit. See Digene Corp. v. Third Wave Techs., No. 07-C-0022-C, 2007 U.S. Dist. Lexis 53882 (W.D. Wis. July 23, 2007) ("Claim Construction Opinion"); Digene Corp. v. Third Wave Techs., Inc.,

No. 07-C-0022-C, 2007 U.S. Dist. Lexis 73010 (W.D. Wis. Sept. 26, 2007) ("Opinion Denying Reconsideration"). Third Wave cross-appeals from the court's grant of summary judgment dismissing Third Wave's antitrust counterclaims. See Digene Corp. v. Third Wave Techs., Inc., 536 F. Supp. 2d 996 (W.D. Wis. 2008) ("Opinion Dismissing Counterclaims"). Because the district court did not err in its determinative claim constructions or in granting summary judgment on Third Wave's antitrust counterclaims, we affirm.

BACKGROUND

Digene owns U.S. Patent 5,643,715 ("the '715 patent"), which relates to diagnosis of human papillomavirus ("HPV") type 52. According to the '715 patent specification, "HPVs are grouped into types based on the similarity of their" deoxyribonucleic acid ("DNA") sequences. '715 patent col.1 ll.49–50. When Digene applied for the '715 patent, HPV type 52 was newly discovered and was known to be a common sexually-transmitted disease and a primary cause of cervical cancer. The '715 patent describes characterizing and diagnosing HPV type 52, and differentiating it from other HPV types by providing "nucleic acid hybridization probes which are specific for HPV type 52." Id. at col.4 ll.30–32. At the time of filing, HPV types 1-51 were known, but other types have since been discovered.

Digene makes DNA-based HPV testing systems that are approved by the U.S. Food and Drug Administration ("FDA"). Third Wave makes non-FDA-approved HPV test systems consisting of nucleotides that are designed to target HPV 52 and other dangerous HPV types by using a DNA fragment that is homologous to (i.e., will bind

with) HPV 52 DNA, combined with an extra fragment of DNA that functions as an indicator of the HPV's presence.

In January 2007, Digene sued Third Wave for infringement of claims 8, 10–12, and 18–27 of the '715 patent. Each of the asserted claims recites "HPV 52 DNA" that "consists of all or a fragment of an HPV DNA." Id. at col.16 l.43–col.18 l.65. Claims 18 and 21 together contain all the limitations that are contested on appeal, and they read as follows:

> 18. An <u>HPV 52 hybridization probe</u> comprising a member selected from the group consisting of
>
>> (i) <u>HPV 52 DNA labelled with a detectable label</u>, and
>>
>> (ii) HPV 52 RNA labelled with a detectable label,
>>
>> wherein the length of the HPV 52 DNA or HPV 52 RNA is <u>between approximately 15 and 8000 nucleotide bases</u>,
>>
>> wherein the <u>HPV 52 DNA consists of all or a fragment of an HPV DNA</u>, wherein the HPV DNA cross-hybridizes to the HPV portion of clone pCD15 to greater than 50% under moderately stringent conditions,
>>
>> wherein the HPV 52 RNA consists of all or a fragment of an HPV RNA, wherein the HPV RNA cross-hybridizes to the HPV portion of clone pCD15 to greater than 50% under moderately stringent conditions, and
>>
>> wherein the HPV 52 DNA and HPV 52 RNA do not hybridize to DNA from HPV types 1 through 51 under stringent conditions.
>
> 21. An <u>HPV hybridization probe</u> composition comprising
>
>> (a) a member selected from the group consisting of
>>
>>> (i) <u>HPV 52 DNA labelled with a detectable label</u> and
>>>
>>> (ii) HPV 52 RNA labelled with a detectable label,
>>
>> wherein the length of the HPV 52 DNA or HPV 52 RNA is <u>between approximately 15 and 8000 nucleotide bases</u>,

wherein the <u>HPV 52 DNA consists of all or a fragment of an HPV DNA</u>, wherein the HPV DNA cross-hybridizes to the HPV portion of clone pCD15 to greater than 50% under moderately stringent conditions,

wherein the HPV 52 RNA consists of all or a fragment of an HPV RNA, wherein the HPV RNA cross-hybridizes to the HPV portion of clone pCD15 to greater than 50% under moderately stringent conditions, and

wherein the HPV 52 DNA and HPV 52 RNA do not hybridize to DNA from HPV types 1 through 51 under stringent conditions, and

(b) DNA or RNA of at least one other HPV type labelled with a detectable label.

'715 patent col.17 l.22–col.18 l.2 (emphases added).

In July 2007, the district court construed certain claim terms from the '715 patent. Among others, the court construed the term "HPV 52 DNA" to mean "a DNA molecule that is only type 52 HPV." <u>Claim Construction Opinion</u>, 2007 U.S. Dist. Lexis 53882, *2. The court reasoned that the applicant had disclaimed a molecule including fragments of later-discovered HPV types by stating during prosecution that "the claimed HPV 52 DNA must be derived from only type 52 HPV DNA," and the applicant had changed the transitional phrase after "HPV 52 DNA" from "comprising" to "consists of." <u>Id.</u> at *17–18. The court construed the phrase "consists of all or a fragment of an HPV DNA" to mean "consists of all or a fragment of one HPV DNA that does not contain any other DNA," reasoning that "an" means "one and only one" when following the transitional phrase "consists of," and that this definition accorded with the court's definition of "HPV 52 DNA." <u>Id.</u> at *2, *14–15. Digene later moved for reconsideration of certain claim terms, and on reconsideration, the court added that its constructions did not exclude mutations or subtypes within HPV 52 DNA, as those are found in HPV 52 DNA and would be

covered by the claim. Opinion Denying Reconsideration, 2007 U.S. Dist. Lexis 73010, *15–16.

The district court further construed the limitation "between approximately 15 and 8000 nucleotide bases" to mean "between 15 and approximately 8000 nucleotide bases," reasoning that the applicant had disavowed fewer than 15 bases during prosecution. Claim Construction Opinion, 2007 U.S. Dist. Lexis 53882, *19–25. The court construed the term "HPV 52 DNA labeled with a detectable label" to mean "HPV 52 DNA that has a detectable label that is not DNA," reasoning that, given previous constructions, the label could not be DNA. Id. at *26. On reconsideration, the court added that labeling requires adding a distinctive new property to existing DNA, and DNA does not add such a new property to HPV 52 DNA. Opinion Denying Reconsideration, 2007 U.S. Dist. Lexis 73010, *3–15. Thus, DNA cannot be a label. See id. With respect to "HPV 52 hybridization probe," which appears in the preamble of claim 18, the court determined that the term required construction because the specification consistently described the invention as specific to HPV 52. Claim Construction Opinion, 2007 U.S. Dist. Lexis 53882, *26–32. The court therefore construed it to mean a "nucleic acid molecule that is specific for HPV 52 DNA and that differentiates HPV 52 DNA from DNA of all other types." Id. at *32. The court finally construed "HPV hybridization probe" appearing in the preamble of claim 21 to mean a "nucleic acid molecule that is specific for the DNA of any one type of HPV and differentiates the DNA of that type from DNA of all other HPV types." Id. at *32–33.

Third Wave also counterclaimed, asserting certain antitrust violations, and in January 2008, the district court granted Digene's motion for summary judgment,

dismissing Third Wave's counterclaims. Opinion Dismissing Counterclaims, 536 F. Supp. 2d 996. The court held that Digene did not enter into exclusive dealing arrangements, nor did it foreclose the relevant market to competitors, as Third Wave was a competitor before Digene signed the contracts that Third Wave alleged to be exclusionary. Id. at 1005. Moreover, according to the court, Digene's long-term contracts and termination fees had a valid business justification, viz., allowing both parties to rely on an ongoing relationship. Id. The court thus held that Third Wave could not prove its antitrust counterclaims based on exclusive dealing arrangements.

Digene timely appealed several of the district court's claim constructions, and Third Wave cross-appealed the court's grant of summary judgment dismissing its antitrust counterclaims. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

A.  Claim Construction

Digene argues that the district court misconstrued the phrase "HPV 52 DNA consists of all or a fragment of an HPV DNA." Digene argues that, in limiting the construction of "HPV 52 DNA" to a molecule that is only HPV type 52, the court disregarded the inventor's definition in the prosecution history and in the claims themselves. According to Digene, the inventor defined the HPV 52 DNA molecule on the basis of three explicit distinguishing characteristics: (1) having a length between approximately 15 and 8000 nucleotides; (2) having all or part of the DNA of an HPV DNA that cross-hybridizes to the HPV portion of the deposited clone pCD15 to greater than 50% under moderately stringent conditions; and (3) not hybridizing to HPV types 1–51 under stringent conditions. Digene asserts that, during prosecution, the applicant

pointed out that HPV 52 DNA molecules can be described in ways other than their nucleotide sequence, and that DNA can be synthesized with certain nucleotides replaced with other nucleotides, but the result is still HPV 52 DNA. Thus, according to Digene, "HPV 52 DNA" cannot be defined solely by its nucleotide sequence. Digene also argues that the applicant's statement during prosecution that the "claimed HPV 52 DNA must be derived from only type 52 HPV DNA" simply described the origin of the DNA, not its specific structure. Digene adds that the use of the transitional phrase "consists of" after "HPV 52 DNA" only limited the claim to an HPV DNA and did not limit the definition of "HPV 52 DNA."

Digene also argues that the court erroneously limited "an HPV DNA" to one and only one HPV DNA that does not contain any other DNA. According to Digene, HPV DNA is not tied to any specific DNA sequence, but is based on a hybridization property. Digene asserts that the overall transitional phrase in each claim at issue is "comprising," even though the particular "HPV 52 DNA consists of all or a fragment of an HPV DNA." Digene thus asserts that the phrase "consists of" within the claim does not govern the construction. Because of the initial open-ended transitional phrase and because, according to Digene, the specification does not limit "an" to "one," Digene argues that "an" should have been construed to mean "one or more." Digene also argues that the court's construction excludes mutations, subtypes, and synthesized DNA, contrary to the court's stated intent not to exclude those possibilities.

Third Wave responds, regarding the phrase "HPV 52 DNA," that Digene is attempting on appeal to raise a new claim construction, as, before the district court, Digene did not attempt to have the phrase defined functionally. Third Wave also argues

that the applicant's statement during prosecution, that "the claimed HPV 52 DNA must be derived from only type 52 HPV DNA," restricted the definition to only HPV 52 DNA. Furthermore, according to Third Wave, claim 21 recites both "HPV 52 DNA" and "DNA . . . of at least one other HPV type," distinguishing them from each other, so the definition of "HPV 52 DNA" must be limited to DNA of only type 52 and not include DNA of another HPV type.

Third Wave also argues that the court's construction of "consists of all or a fragment of an HPV DNA" is compelled by the use of the transitional phrase "consists of," which limits the clause after it, and "an," which means "one." Thus, according to Third Wave, "an HPV DNA" must be limited to one and only one HPV DNA. Third Wave also asserts that nothing in the district court's claim construction prevents the HPV DNA from containing variances and mutations.

We review claim construction <u>de</u> <u>novo</u> on appeal. <u>Cybor Corp. v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). We agree with Third Wave that the district court reasonably construed the phrase "HPV 52 DNA consists of all or a fragment of an HPV DNA," construing "HPV 52 DNA" to mean "a DNA molecule that is only type 52 HPV," and construing "consists of all or a fragment of an HPV DNA" to mean "consists of all or a fragment of one HPV DNA that does not contain any other DNA." We also agree with Third Wave that, as the district court held, "[n]othing in the court's construction suggests or requires exclusion of mutations or subtypes." <u>Opinion Denying Reconsideration</u>, 2007 U.S. Dist. Lexis 73010, *15.

To determine the meaning of "HPV 52 DNA," we begin by considering the language of the claims. <u>See</u> <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1314 (Fed. Cir.

2005) (en banc). The claims of the '715 patent that recite HPV 52 DNA all recite additionally three distinguishing characteristics that Digene points out are essential to the definition of its invention. See '715 patent col.16 l.13–col.18 l.65. Those distinguishing characteristics emphasize the specificity of the definition of HPV 52 DNA. Moreover, the definition of the term "HPV 52 DNA" is further limited by other claim language. As Third Wave points out, the language of claim 21 distinguishes "HPV 52 DNA" from DNA of other HPV types by reciting both "HPV 52 DNA" and "DNA or RNA of at least one other HPV type." The applicant therefore distinguished HPV 52 DNA from the DNA of other HPV types. Thus, the claim language provides support for Third Wave's position that "HPV 52 DNA" means "a DNA molecule that is only type 52 HPV."

The prosecution history further supports the limited scope of "HPV 52 DNA," and the district court permissibly found the prosecution history conclusive in this case. "[A] court should also consider the patent's prosecution history, if it is in evidence. . . . Like the specification, the prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent." Phillips, 415 F.3d at 1317 (citations and quotation marks omitted). During prosecution, the applicant explained, with reference to a claim amendment, that "the HPV 52 DNA is defined by three characteristics." In explaining the second characteristic, the applicant stated that "[s]ince the HPV portion of clone pCD15 is the HPV genome of the type 52 HPV discovered by applicant, and since cross-hybridization of an HPV to this type 52 HPV to greater than 50% under moderately stringent conditions identifies it, by definition, as an HPV of type 52, the claimed HPV 52 DNA must be derived from only type 52 HPV DNA." Claim Construction Opinion, 2007 U.S. Dist. Lexis 53882, *17. The applicant therefore

disclaimed a meaning of "HPV 52 DNA" that was derived from anything but HPV 52 DNA. See Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998) ("[E]xplicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim."); Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."). Digene argues that the applicant's statement, using the word "derived," simply described the origin of the DNA, not its specific structure. However, the statement, including the word "only," unequivocally limited the makeup of "HPV 52 DNA" to that specific type, not allowing it to include any other type of DNA. We therefore affirm the district court's construction of "HPV 52 DNA" as meaning "a DNA molecule that is only type 52 HPV."

We also agree with Third Wave that the district court correctly construed "consists of all or a fragment of an HPV DNA" to mean "consists of all or a fragment of one HPV DNA that does not contain any other DNA." As the district court correctly noted, "[i]t is a canon of construction that 'a' or 'an' following the phrase 'consisting of' is generally read as meaning one." Claim Construction Opinion, 2007 U.S. Dist. Lexis 53882, *14 (citing Norian Corp. v. Stryker Corp., 432 F.3d 1356, 1359 (Fed. Cir. 2005) ("In particular, this court has interpreted the word 'a' in its singular sense when, as in this case, it has been used in conjunction with the closed transitional phrase 'consisting of.'")). Digene argues that the transitional phrase for the entire claim is "comprising," so the open transitional phrase should govern the claim term's meaning, and the word "an" should be construed to mean "one or more." Digene points to Mannesman Demag

Corp. v. Engineered Metal Prods. Co., 793 F.2d 1279, 1282-83 (Fed. Cir. 1986), and In re Crish, 393 F.3d 1253, 1257 (Fed. Cir. 2004), for support.  In both cases we held that a claim with the overall transitional phrase "comprising," containing a limitation with the transitional phrase "consisting of," allowed for the addition of other elements to the overall claim.  However, neither case opened the individual elements limited by the term "consisting of."  If the term "consists of" appears in the body of a claim, it does not limit the entire claim as such, but it does limit the clause for which it acts as a transition to only those elements found in that particular clause.  Thus, the clause "consists of" generally requires that the word "an" following it be limited to one and only one. Because the "HPV 52 DNA consists of all or a fragment of an HPV DNA," the term "an HPV DNA" cannot be expanded to include fragments of DNA that come from multiple HPV types.  We therefore affirm the district court's construction of "consists of all or a fragment of an HPV DNA" as meaning "consists of all or a fragment of one HPV DNA that does not contain any other DNA."

We finally agree with Third Wave that the district court's claim constructions do not exclude possible mutations or subtypes.  As the district court stated, "[i]f the HPV genome from which the HPV 52 DNA must come contains mutations, those mutations will be found in the HPV 52 DNA and will be covered by the claim."  Opinion Denying Reconsideration, 2007 U.S. Dist. Lexis 73010, *15-16.

Digene additionally argues that the district court erred in its constructions of "between approximately 15 and 8000 nucleotide bases," "HPV 52 DNA labeled with a detectable label," "HPV 52 hybridization probe," and "HPV hybridization probe." However, at oral argument, Digene candidly conceded that it could not prove

infringement under the district court's claim constructions of "HPV 52 DNA consists of all or a fragment of an HPV DNA." Oral Argument at 6:34-7:06, <u>available at</u> http://oralarguments.cafc.uscourts.gov/mp3/2008-1242.mp3 (Judge Prost: "You mean even if we were to affirm the district court's construction of HPV 52 DNA and the 'consists' language, you say there would still be infringement?" William K. West, Jr. (attorney for Digene): "I think that's the reason why noninfringement was conceded, because the problem here is—" Judge Prost: "But could you just sort of direct my [question], if we were to affirm—" West: "If you were to affirm, I think there would be, they would avoid infringement, if it has to be only something that is purely HPV 52 DNA."). While we do not find Digene's arguments to be convincing on those points, we need not address them in detail because of Digene's concession.

B.    <u>Antitrust Counterclaims</u>

On cross-appeal, Third Wave argues that the district court erred in granting summary judgment dismissing its antitrust counterclaims. Third Wave argues that Digene uses exclusionary contract penalties to maintain its monopoly power. To demonstrate that the penalties were exclusionary, Third Wave asserts that it raised a genuine issue of material fact requiring a jury to decide whether Digene's business justifications for its early termination and purchasing commitment penalties were pretextual. Third Wave asserts that its evidence of such pretext included that Digene's termination penalties exceeded its costs when a customer switched providers, and that there is no evidence suggesting that Digene needed to ensure recovery of up-front costs in the first place. A witness from Digene admitted that Digene did not impose a termination penalty when a customer stopped offering HPV testing, which, Third Wave

argues, shows that the early termination penalties were unjustified and pretextual. Indeed, Third Wave argues, Digene's contracts sometimes increased termination penalties over time, as the risk of losing up-front costs declined. Thus, according to Third Wave, Digene's contracts were actually intended to foreclose the market to competition.

Third Wave also argues that raising rivals' costs is a well-recognized anticompetitive action. According to Third Wave, Digene's penalties substantially increased the cost to customers of switching suppliers, forcing Third Wave to compensate its customers in order to persuade them to make the switch. Thus, according to Third Wave, even customers interested in Third Wave's technology were unable to purchase it while under contract with Digene.

Digene responds that its conduct has not been anticompetitive because, since January 2005, contracts with each large customer have come up for renewal, and Third Wave has had the opportunity to compete for them; it has simply lost the competition. Digene argues that the contracts with its largest customers after 2005, accounting for more than 60% of Digene's sales, had no termination penalties and could be exited on short notice, showing that its contracts were not exclusionary. Regarding minimum purchase provisions, according to Digene, customers frequently needed more than the minimum amounts and could buy them from Third Wave or any other supplier, also demonstrating a lack of exclusion. Digene argues that there is no evidence that termination fees excluded anyone from the market, and, according to Digene, Third Wave admits that Digene has never enforced a termination clause since Third Wave has been in the market. Digene also argues that we need not reach the question of

pretext, but if we do, its justifications for contract penalties were not pretextual, as Third Wave does not even challenge two of the district court's reasons for dismissal. Those reasons are that Digene's penalties both assure a predictable supply of business for Digene and permit customers to amortize equipment costs over time.

We review a district court's grant of a motion for summary judgment de novo. Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 149 F.3d 1309, 1315 (Fed. Cir. 1998). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). We apply "the law of the regional circuit in which [the] district court sits" to our review of federal antitrust claims that do not involve our exclusive jurisdiction. In re Independent Serv. Orgs. Antitrust Litig., 203 F.3d 1322, 1325 (Fed. Cir. 2000). In this case, we apply the law of the Seventh Circuit.

We agree with Digene that there was no genuine issue of material fact in dispute and that the district court correctly granted summary judgment against Third Wave on its antitrust counterclaims. The facts in this case are not in dispute. Third Wave appears to challenge primarily the district court's holding with respect to Section 2 of the Sherman Act. That provision makes it unlawful to maintain a monopoly through anticompetitive or exclusionary practices. See 15 U.S.C. § 2 (2006). That offense has two elements, "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic

accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Such willful conduct must be objectively anticompetitive to violate the Act. See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004).

Digene admits, for the purposes of the antitrust counterclaims in this case, that it possesses monopoly power in the relevant market. But Third Wave argues that Digene's allegedly exclusionary contracts are anticompetitive. To prevail on such an exclusive dealing claim, Third Wave must show that a substantial share of the relevant market was foreclosed to competitors. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 393 (7th Cir. 1984) (Plaintiff alleging exclusive dealing "must prove that [defendant's conduct] is likely to keep at least one significant competitor of the defendant from doing business in a relevant market."). Thus, "to be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'" United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001). As the district court found, Digene's contracts were not exclusive; they did not prohibit Digene's customers from buying tests from Third Wave. Opinion Dismissing Counterclaims, 536 F. Supp. 2d at 1005.

The district court also correctly found that the contracts did not have an anticompetitive effect. Id. Instead, as Digene points out and Third Wave does not dispute, the vast majority of Digene's contracts were entered into after Third Wave was already competing on the market, when Third Wave could have prevented those contracts from existing in the first place. Id. Third Wave's failure to win at least some of that business was due to the lack of FDA approval for its product, which was not the fault of Digene. Id. The existence of competition for the contract, even though Third

Wave lost that competition, demonstrates a lack of anticompetitive effect. See Menasha Corp. v. News Am. Mktg. In-Store, Inc., 354 F.3d 661, 663 (7th Cir. 2004) ("[C]ompetition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress."); Paddock Publ'ns, Inc. v. Chicago Tribune Co., 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common. . . . Exclusive contracts make the market hard to enter in mid-year [for a one-year contract term] but cannot stifle competition over the longer run, and competition of this kind drives down the price of [products], to the ultimate benefit of consumers."). Although Digene's contracts were longer than the one-year exclusive contracts that the court found to be protected in Paddock, they were not exclusive and provided for termination (some without any fees), and Digene never enforced a termination clause against a customer after Third Wave entered the market. See Opinion Dismissing Counterclaims, 536 F. Supp. 2d at 1000-01. Thus, even if Digene's contract's raised Third Wave's costs, Third Wave had the opportunity to compete for those contracts, and no anticompetitive effect was shown to be caused by them.

Third Wave asserts that Digene's alleged business justifications for its contractual penalties were actually pretexts for its intent to freeze Third Wave out of the market. However, without proof of anticompetitive effect, no anticompetitive practice is shown. See Microsoft, 253 F.3d at 58-59 (holding that a defendant may offer a procompetitive justification for its conduct, which can be rebutted by showing pretext, only if plaintiff has first shown anticompetitive effect). Thus, because Third Wave has

failed to present any evidence of anticompetitive effect, Digene's intent and whether its justifications were pretextual are irrelevant.

We have considered Third Wave's other arguments on cross-appeal and find them unpersuasive.

## CONCLUSION

Accordingly, the judgment of the district court is affirmed.

### AFFIRMED